ANN SCHROEDER, BY HER GUARDIAN AD LITEM MARION SCHROEDER; AND JOHN SCHROEDER AND MARION SCHROEDER, INDIVIDUALLY; AND THOMAS SCHROEDER BY HIS GUARDIAN AD LITEM, MARION SCHROEDER, PLAINTIFFS-APPELLANTS, v. HAROLD PERKEL, M. D. AND BERNARD VENIN, M. D., DEFENDANTS-RESPONDENTS.

Argued January 12, 1981—Decided July 15, 1981.

54

*Richard C. Ehnert* argued the cause for appellants (*Chasan, Leyner, Holland & Tarrant,* attorneys).

*Donald L. Mantel* argued the cause for respondents (*Weiner, Ostranger, Pearl & Mantel,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The sole issue on this appeal is the propriety of a grant of partial summary judgment to defendant physicians in a "wrongful conception" or "wrongful birth" action brought by the parents of a child with cystic fibrosis.

The parents allege that the negligent failure of defendants to diagnose cystic fibrosis, a hereditary disease, in their first child deprived the parents of an informed choice whether to have a second child. Consequently, the parents seek to recover the incremental medical costs associated with raising the second child who also suffers from cystic fibrosis. They claim that these costs are attributable directly to the negligence of the defendants.

The trial court denied defendants' motion for summary judgment, but the Appellate Division reversed. We granted certification, 84 *N.J.* 438 (1980). We reverse the judgment of the Appellate Division and remand the matter for trial.

I

Because this appeal presents for review an order of partial summary judgment for defendants, we must accept as true all the allegations in plaintiffs' complaint, affidavits and depositions and accord to them the benefit of all reasonable inferences. *Portee v. Jaffee*, 84 *N.J.* 88, 90 (1980); *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 74–75 (1954).

Defendants, Dr. Perkel and his associate Dr. Venin, are pediatricians certified by the American Board of Pediatrics and licensed to practice medicine in this state. They treated infant plaintiff, Ann Schroeder, from May 1970 until September 1974. During that time, they failed to diagnose Ann's illness as cystic fibrosis, a genetically transferred disease. Because Mr. and Mrs. Schroeder, Ann's parents, were not told that they were carriers of cystic fibrosis, they claim that they were deprived of an informed choice of whether to assume the risk of a second child. Before they learned that Ann suffered from cystic fibrosis, Mrs.

Schroeder became pregnant. One month after learning of Ann's affliction, Mrs. Schroeder gave birth to a second child, Thomas, who also suffers from cystic fibrosis.

Cystic fibrosis is one of the most common fatal genetic diseases in the United States and affects approximately one out of every 1,800 babies. An insidious and incurable disease, cystic fibrosis is carried by some parents as a recessive gene. There is no reasonably certain method of detecting whether a parent is a "carrier" of the disease, and parents may be carriers without knowing it. When both parents are carriers, they may anticipate that cystic fibrosis will affect their children according to the Mendelian ratio. The statistical probability that cystic fibrosis will affect the children is: 25% probability of a normal child, 50% probability of a carrier child, and 25% probability of an afflicted child.

In general, cystic fibrosis causes certain glands to malfunction and produce abnormally thick mucous. The most commonly affected body systems are the digestive tract and the respiratory system. In the digestive tract, mucous blocks ducts in the pancreas, preventing enzymes from reaching the intestines. One result is an inability to digest fats. Respiratory problems, however, are the most serious symptoms of cystic fibrosis. In the respiratory system, mucous clogs passages and causes air to become trapped in the lungs. Respiratory problems cause chronic pulmonary infection, emphysema and over 90% of all deaths of patients with cystic fibrosis. *Metabolic Basis of Inherited Disease* 1684 (4 ed. 1978).

Standard treatment of cystic fibrosis consists of antibiotics to control pulmonary infection and a restricted diet. Mucous is drained from the lungs by elevating the victim's feet above the head and clapping or gently pounding the back and chest. Hospital or institutional care frequently is not required except in emergencies or until the terminal stages of the illness.

In many respects, people afflicted with cystic fibrosis may lead normal lives. The prospects for one suffering from cystic

fibrosis, however, are grim. Life expectancy is foreshortened, and death usually occurs in the late teen years.

Cystic fibrosis cannot be detected in a fetus. A safe, simple and highly reliable test, however, can be performed shortly after birth. Known as the "sweat test," it involves an analysis of perspiration, which contains an abnormally high concentration of salt in someone suffering from cystic fibrosis. A positive test indicates not only that both parents are carriers, but also the probabilities that future children of those parents will be afflicted with cystic fibrosis.

As an infant, Ann suffered from a digestive disorder diagnosed by Dr. Swiney, a general practitioner, as colic. When the symptoms persisted through her second year, Dr. Swiney referred Ann to the defendant physicians.

Dr. Venin diagnosed Ann's condition as a malabsorption syndrome resulting from an intolerance for fats. He prescribed a special diet low in starch and high in protein. The diet, which relieved her symptoms, is the same diet prescribed for persons suffering from cystic fibrosis. Dr. Venin did not deem the diagnosis final, however, and indicated that alternative diagnoses should be considered and eliminated. His notes from his initial interview with Ann show the entry "R.O. [meaning "rule out"] cystic fibrosis."

Dr. Venin did not perform a sweat test. Instead, he relied on a stool test performed by Dr. Swiney, and he assured Mr. and Mrs. Schroeder that the stool test ruled out cystic fibrosis. Nonetheless, Dr. Venin admits that the stool test is not the correct or preferred test to use in diagnosing cystic fibrosis. Between May 1970 and September 1974, Dr. Venin also treated Ann for respiratory complaints that he diagnosed as an allergic problem.

In June 1974, Mr. and Mrs. Schroeder read a newspaper article describing the symptoms of cystic fibrosis. Feeling that the article described Ann's condition, they asked Dr. Venin about the possibility of cystic fibrosis. According to Mrs. Schroeder,

Dr. Venin told her in July 1974 that Ann "couldn't possibly have cystic fibrosis," an assertion disputed by Dr. Venin. Mrs. Schroeder stated that Dr. Venin informed her that the stool test performed by Dr. Swiney had eliminated the possibility of cystic fibrosis and that Ann definitely was not suffering from this disease.

When Ann's condition worsened in September 1974, Dr. Venin referred her to Dr. Grotsky, a specialist in digestive disorders. Dr. Grotsky performed the sweat test. The test established that Ann suffered from cystic fibrosis. Unfortunately, by that date Mrs. Schroeder was in the eighth month of her pregnancy with Thomas. The delay in the diagnosis had precluded Mr. and Mrs. Schroeder from making an informed choice as to whether or not to assume the risk of conceiving a second child with cystic fibrosis. The delay also had prevented them from making an informed choice whether Mrs. Schroeder should have an abortion.

On depositions, Mrs. Schroeder testified:

Q. If you had been made aware at an earlier time that Ann had cystic fibrosis, would you have become pregnant with Thomas?

     \*      \*      \*      \*      \*      \*      \*      \*

A. No. I would not have.

     \*      \*      \*      \*      \*      \*      \*      \*

Q. If you had been told that Ann had cystic fibrosis in late January or early February of 1974 would you have aborted the pregnancy?

A. Yes.

A consideration of the risk of cystic fibrosis for subsequent children led Mr. Schroeder to submit to a vasectomy even before the birth of Thomas. A sweat test performed on Thomas two weeks after his birth revealed that he, like his sister, was afflicted with cystic fibrosis.

Mr. and Mrs. Schroeder instituted this action on behalf of themselves and Ann and Thomas. In an amended complaint, they asserted four causes of action. In Count One, Mrs. Schroeder, as guardian ad litem of Ann, sought damages for pain and

suffering caused by the allegedly negligent failure of defendants to diagnose that Ann suffered from cystic fibrosis. In Count Two, Mr. and Mrs. Schroeder asserted their own claim for the costs of past medical care for Ann. In Count Three, Mr. and Mrs. Schroeder sought damages in a "wrongful birth" action for the failure of defendants to advise them that Ann suffered from cystic fibrosis, thereby depriving Mr. and Mrs. Schroeder of the alternative of preventing the conception of Thomas. They sought damages not only for the incremental medical costs, but also for the mental anguish involved in caring for Thomas. In Count Four, Mrs. Schroeder, as guardian ad litem of Thomas, asserted a claim for his wrongful life. In that claim she sought damages for his pain and suffering resulting from his birth and life as a child afflicted with cystic fibrosis.

Defendants moved for summary judgment on all four counts. The trial court denied defendants' motion for summary judgment on Counts One and Two (which included claims for medical costs and pain and suffering of Ann), and defendants did not seek leave to appeal. The trial court granted the motion for summary judgment for defendants on the fourth count asserting the claim for the "wrongful life" of Thomas. The Appellate Division affirmed, and Mr. and Mrs. Schroeder did not file a petition for certification from that judgment.

With respect to Count Three, the trial court granted defendants' motion for summary judgment as to the claim of Mr. and Mrs. Schroeder for mental anguish, but denied the motion on the Schroeders' claim for incremental medical expenses from the alleged wrongful birth of Thomas. The Appellate Division reversed the order granting summary judgment for defendants on the claim of Mr. and Mrs. Schroeder for mental anguish, but also reversed and entered judgment for defendants on the claim for incremental medical expenses.

The different results reached by the trial court and Appellate Division are explained by the fact that in the interim between the two decisions we rendered our opinion in *Berman v. Allan,*

80 *N.J.* 421 (1979). In *Berman*, this Court held that the parents of a child born with Down's Syndrome had a cause of action for "wrongful birth" against the mother's obstetricians. Her physicians had failed to advise Mrs. Berman, who was over the age of 35, of the probabilities of a woman of her age giving birth to a child afflicted with Down's Syndrome. Also, they had failed to advise her of the availability of amniocentesis [1], a procedure that would have disclosed Down's Syndrome in the fetus. They thereby deprived her of the freedom to decide to have a abortion. Until the decision in *Berman,* parents did not have a claim for "wrongful birth" of an infant. *See Gleitman v. Cosgrove,* 49 *N.J.* 22 (1967). The trial court understandably relied upon *Gleitman,* and the Appellate Division reversed because of the intervening decision in *Berman.* In the present case, defendants did not seek leave to appeal the Appellate Division's reversal of the grant of their motion for summary judgment on the Schroeders' claim for mental anguish. Thus, the only issue before us is the propriety of the judgment for defendants entered by the Appellate Division on the claim of Mr. and Mrs. Schroeder for incremental medical costs for their second child, Thomas, who suffers from cystic fibrosis.

## II

In determining the rights and duties of the parties, we must consider initially whether the defendant physicians owed a duty to Mr. and Mrs. Schroeder to diagnose Ann's affliction and to inform them that she suffered from cystic fibrosis. If that duty exists, we must then consider whether Mr. and Mrs. Schroeder have asserted facts establishing a breach of the duty. Finally, we shall consider whether Mr. and Mrs. Schroeder have asserted sufficient facts to establish that the breach of duty proximately

---

[1] Amniocentesis is a procedure that involves the aspiration of fluid from the amniotic sac. Amniocentesis, however, cannot lead to the detection of cystic fibrosis in an unborn child.

caused the extraordinary medical expenses that they claim they will sustain in caring for Thomas.

■ Defendants contend that Ann was their patient and that their duty was to her, not her parents. In effect, they contend that they had no duty to Mr. and Mrs. Schroeder to advise them that their infant child was suffering from cystic fibrosis. The implication is that, if defendants had no duty to Mr. and Mrs. Schroeder, then defendants cannot be liable for depriving them of the decision not to have another child. Consequently, the defendants argue they cannot be liable for the expenses Mr. and Mrs. Schroeder will sustain in caring for Thomas. We disagree. The contention of the defendant physicians takes too myopic a view of the responsibilities of a physician treating a child with a genetically transferable disease such as cystic fibrosis. *See* Note, "Father and Mother Know Best: Defining the Liability of Physicians for Genetic Counseling," 87 *Yale L.J.* 1488, 1494 (1978).

■ The scope of duty in negligence, except as limited by policy considerations, is coextensive with the reasonable foreseeability of the consequences of a negligent act. *Portee v. Jaffee, supra,* 84 *N.J.* at 94–96 (emotional distress of mother from viewing suffering and death of child sufficiently foreseeable to impose liability on tortfeasor causing injury to child); *Trentacost v. Brussel,* 82 *N.J.* 214, 223 (1980) (mugging of tenant was foreseeable result of landlord's negligent failure to provide locks on apartment house entrance door); *Hill v. Yaskin,* 75 *N.J.* 139, 144–146 (1977) (foreseeability of theft of car left unlocked in high crime area and subsequent attempt by police to intercept thieves sufficient to impose liability on car owner for injuries sustained by police officer while apprehending thieves in stolen car).

The foreseeability of injury to members of a family other than one immediately injured by the wrongdoing of another must be viewed in light of the legal relationships among family members. A family is woven of the fibers of life; if one strand is

damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a web of interconnected legal interests. This Court has recognized that a wrongdoer who causes a direct injury to one member of the family may indirectly damage another. Consequently, husbands and wives have causes of action for loss of consortium when the other spouse is injured. *Ekalo v. Constructive Serv. Corp.,* 46 *N.J.* 82, 95 (1965) (recognition of claim by wife for loss of husband's consortium); *Nuzzi v. United States Cas. Co.,* 121 *N.J.L.* 249, 254 (E. & A. 1938) (husband has an action for loss of consortium of wife). Parents can recover for loss of companionship and advice in an action for the wrongful death of a minor child, *Green v. Bittner,* 85 *N.J.* 1, 4 (1980); an infant can recover against a tortfeasor for prenatal injuries suffered as a result of injuries to the mother in an automobile accident, *Smith v. Brennan,* 31 *N.J.* 353, 361 (1960). A parent has a cause of action for mental anguish resulting from viewing the suffering and death of a child caused by the negligence of a tortfeasor. *Portee v. Jaffee, supra,* 84 *N.J.* at 101. As a corollary to their duty to provide medical care for their children, parents can maintain an independent action to recover from a tortfeasor for medical expenses incurred for a child. *Friedrichsen v. Niemotka,* 71 *N.J.Super.* 398, 402 (Law Div.1962); *cf. Greenspan v. Slate,* 12 *N.J.* 426, 443 (1953) (parents under legal obligation to pay for necessary medical care provided to child in an emergency).

█ Foreseeability of harm to parents from an injury to a child flows not only from the bonds between parent and child, but also from the responsibility of parents to provide medical care for their children. In a theoretical sense, the primary obligation to pay for the medical expense incurred by a child may be that of the estate of the child. *Gleitman, supra,* 49 *N.J.* at 64 (Weintraub, C. J., dissenting in part). Generally, however, parents pay for the medical expenses of their children. Indeed, the willful failure of parents to provide "proper and sufficient" medical care for their child is a crime. *N.J.S.A.* 9:6–1; *N.J.S.A.*

2C:24–4. In this case, we were informed at oral argument that Mr. and Mrs. Schroeder have borne and will continue to bear the expense of the medical treatment of Thomas. It would be unreasonable to compel parents to bear the expense of medical treatment required by a child and to allow the wrongdoer to go scot-free. *See id.* at 49 (Jacobs, J. dissenting). In this context, a wrong should not go unrequited and an entire family left to suffer because of the dry technicality that Thomas has the primary obligation to pay for his own medical expenses. In addition, exoneration of the defendants would provide no deterrent to professional irresponsibility and would be contrary to the direction of our decisions in family torts. *Ibid.*

A physician's duty thus may extend beyond the interests of a patient to members of the immediate family of the patient who may be adversely affected by a breach of that duty. Here, the physicians had not only a duty to Ann, but an independent duty to Mr. and Mrs. Schroeder to disclose to them that Ann suffered from cystic fibrosis. The wrong allegedly committed by defendants was the failure to disclose material information. The defendants should have foreseen that parents of childbearing years, such as Mr. and Mrs. Schroeder, would, in the absence of knowledge that Ann suffered from cystic fibrosis, conceive another child. They should have foreseen also that a second child could suffer from cystic fibrosis and that, if so afflicted, would sustain certain medical expenses. *See generally* Note, 87 *Yale L.J., supra,* at 1506–1508.

In his separate opinion, our colleague Justice Handler would extend the duty of the physicians to Thomas. (*Post* at 74–75). That is, Justice Handler would recognize in Thomas a cause of action for the diminution in the capacity of his parents to love and care for him. This Court, however, has declined to recognize claims for diminished parenthood and wrongful life. *Berman, supra,* 80 *N.J.* at 429; *id.* at 434 (Handler, J., concurring in part and dissenting in part). Furthermore, Mr. and Mrs. Schroeder do not assert any such claims on this appeal. Policy

considerations suggest that we proceed judiciously in recognizing causes of action in one member of a family for direct injury to another member. Given the "sensitive and subtle judgments" involved (*post* at 76), we believe the more judicious course of action is not to pass upon a claim for diminished parenthood on this appeal.

■■■ The claim of Mr. and Mrs. Schroeder for medical expenses incurred for Thomas results from their own independent claim, not one that is derivative from Thomas. *Berman, supra*, 80 *N.J.* at 430–431. In *Berman*, we recognized a separate cause of action of parents for the emotional distress in giving birth to a child with Down's Syndrome. Parents have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents. In *Berman*, the parents were deprived of the choice whether to bear the emotional burden of an afflicted child. In the present case, Mr. and Mrs. Schroeder were deprived of the choice whether to conceive a second child with cystic fibrosis whose birth would impose extensive medical expenses upon them.

■■■ Assuming the truth of the facts set forth in opposition to the motion for summary judgment, defendants thus owed a duty of care to Mr. and Mrs. Schroeder. Ann's history and symptoms supported the conclusion that Ann probably suffered from cystic fibrosis. Dr. Venin's notes indicated he should have ruled out cystic fibrosis, and Mr. and Mrs. Schroeder asked him whether Ann suffered from the disease. They also asked him about administering a sweat test, but he assured them it was not necessary. If performed, the sweat test would have disclosed that Ann suffered from cystic fibrosis. His failure to diagnose Ann's cystic fibrosis and to advise Mr. and Mrs. Schroeder that Ann suffered from the disease was a breach of his duty to them.

■■■ The normal measure of damages for the commission of a tort is all damages proximately caused by the injury. *Berman,*

*supra*, 80 *N.J.* at 432. The application of that standard has perplexed courts where the tort results in the birth of an afflicted child. In *Gleitman*, this Court denied recovery for medical expenses to the parents of a child who was born blind and deaf because of the failure of a doctor to advise the mother of the risks of rubella while she was pregnant. The basis for the denial of damages was that because the mother had given birth to a child, albeit afflicted, there was no possible way to measure the damages. At the time of the *Gleitman* decision, abortion was a crime in New Jersey and a woman did not have a constitutional right to an abortion. Thereafter, in *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), the United States Supreme Court declared that a woman had a constitutional right to an abortion in the first three months of her pregnancy. In *Berman*, in part because of the constitutional right of a woman to abort a pregnancy, the Court recognized that the parents had a cause of action for deprivation of the right to decide whether to bear a child with Down's Syndrome. Nonetheless, the Court found "[t]roublesome" the measure of damages and denied recovery for the expenses in raising and supervising a child with Down's Syndrome. 80 *N.J.* at 432.

Other courts have found the delineation of the nature and extent of damages equally troublesome. For example, in a case substantially similar to *Berman*, the New York Court of Appeals divided on the issue of damages. *Becker v. Schwartz*, 46 *N.Y.*2d 401, 386 *N.E.*2d 807, 413 *N.Y.S.*2d 895 (Ct.App.1978). The majority disallowed damages for the emotional distress of the mother, but allowed the costs of institutional care of her retarded child. A dissenting judge, however, would have denied both claims of the parents.

Divergent results of different courts or of different members of the same court reflect the complexity of the problem. Inherent in all the cases are sensitive issues concerning procreation and the right to prevent it by contraception or abortion. Those issues may affect judicial nerves differently with correspondingly different reactions. Another consideration that may affect

courts in different ways is that the cause of action involves injury arising out of the conception and birth of a person not yet born. Also, courts may vary in their perception of the relationships and responsibilities of one family member to another. In brief, the problems of wrongful conception and wrongful birth involve an evaluation not only of law, but also of morals, medicine and society. Thus, it is not surprising that the same issue may elicit divergent judicial responses.

While we recognized the claim for wrongful birth in *Berman*, we declined to allow recovery for the normal expenses of raising a child. Writing for the majority, Justice Pashman concluded: "Under the facts and circumstances here alleged, we find that such an award would be wholly disproportionate to the culpability involved, and an allowance of such a recovery would both constitute a windfall to the parents and place too unreasonable a financial burden upon physicians." *Berman, supra*, 80 *N.J.* at 432. The Court determined that a monetary award for the past and future emotional distress suffered by Mr. and Mrs. Berman would be a more appropriate measure of damages for the deprivation of Mrs. Berman's right to choose to have an abortion.

A critical factor distinguishes the claim of Mr. and Mrs. Schroeder for the extraordinary medical expenses of raising a child with cystic fibrosis from the claim of Mr. and Mrs. Berman. Mr. and Mrs. Schroeder seek damages more proportionate to the wrong of defendants than those sought by Mr. and Mrs. Berman, who sought recovery for the ordinary cost of raising and educating their child. The damages sought by Mr. and Mrs. Schroeder are the medical, hospital and pharmaceutical expenses needed for Thomas' survival. That kind of expense, regularly measured by the courts, includes the prescription of enzymes and antibiotics, checkups every one or two months and hospitalization, which typically occurs only in emergencies or towards the end of the life of the victim. Mr. and Mrs. Schroeder also intend to seek recovery for the cost of daily therapy to Thomas. Until now that therapy has been provided by them without any

outside assistance. At trial they must prove the probability not only of the need and cost of the therapy, but that it will be rendered by someone other than themselves. They cannot recover for services that they have rendered or will render personally to their own child without incurring financial expense.[2]

By limiting damages to those expenses that are actually attributable to the affliction, we are not conferring a windfall on Mr. and Mrs. Schroeder. Although they may derive pleasure from Thomas, that pleasure will be derived in spite of, rather than because of, his affliction. Mr. and Mrs. Schroeder will receive no compensating pleasure from incurring extraordinary medical expenses on behalf of Thomas. There is no joy in watching a child suffer and die from cystic fibrosis.

In other settings, New Jersey law has allowed for the recovery for the reasonable value of past and future medical

---

[2] Two recent decisions of the Appellate Division highlight the problem of assessing damages in wrongful conception, wrongful birth and wrongful life cases. In *P. v. Portadin*, 179 *N.J.Super.* 465 (1981), a husband and wife sued for certain expenses resulting from the birth of a normal child following the allegedly negligent performance of a sterilization procedure upon the wife. Relying on *Berman, supra*, the Appellate Division concluded that plaintiffs were precluded from recovering any expenses for raising their child. The court also concluded, however, that the wife may recover for "the pain and suffering accompanying her pregnancy and delivery and for the wages lost during that period, and that her husband may recover for loss of consortium and for the medical expenses incurred which are attributable to the pregnancy and delivery." *P., supra*, 179 *N.J.Super.* at 472. The court disapproved *Betancourt v. Gaylor*, 136 *N.J.Super.* 69 (Law Div.1975), which held that the costs of raising a child could be recovered in an action for "wrongful pregnancy" based on negligent sterilization when a normal child is born. In another case, *J.P.M. v. Schmid Laboratories, Inc.*, 178 *N.J.Super.* 122 (1981), a husband and wife sued the manufacturer of contraceptive devices in negligence, breach of warranty and strict liability alleging that a defect in a condom caused the wife to become pregnant and give birth to normal twins. The Appellate Division held that interspousal immunity did not preclude a cross-claim for contribution by the manufacturer against the husband for negligent use of the condom. The court declined to permit damages for costs of raising and educating the twins. In this opinion, we neither approve nor disapprove of those decisions.

services necessitated by a defendant's tortious conduct. *Coll v. Sherry*, 29 *N.J.* 166, 174 (1959) (allowance for recovery of damages for past and future medical care and treatment necessitated by tortious injury); *Work v. Philadelphia Supply Co.*, 95 *N.J.L.* 193, 196 (E. & A. 1920) (plaintiff may recover "such reasonable outlay in the future as may be necessary to heal herself and her injuries"). And in settings similar to those before us, courts in other states have awarded to parents recoveries for medical treatment for afflicted children. *Becker v. Schwartz, supra*, 46 *N.Y.*2d at 412–413, 386 *N.E.*2d at 813, 413 *N.Y.S.*2d at 901 (recovery for care and treatment of children with Down's Syndrome born as consequence of physicians' tortious conduct); *Gildner v. Thomas Jefferson Univ. Hosp.*, 451 *F.Supp.* 692, 695 (E.D.Pa.1978) (parents may recover damages for medical expenses and emotional pain caused by child born with Tay-Sachs disease not properly diagnosed by physician's amniocentesis report); *Jacobs v. Theimer*, 519 *S.W.*2d 846, 849 (Tex.Sup.Ct.1975) (recovery disallowed for emotional anguish, but allowed for medical costs of care for defects in child caused by failure to diagnose rubella in mother); *Renslow v. Mennonite Hosp.*, 40 *Ill.App.*3d 234, 239, 351 *N.E.*2d 870, 874 (App.Ct.1976) aff'd, 67 *Ill.*2d 348, 367 *N.E.*2d 1250 (Sup.Ct., 1977) (medical expenses allowed for child injured as a result of negligent administration of blood transfusion to mother prior to pregnancy); *Dumer v. St. Michael's Hosp.*, 69 *Wis.*2d 766, 775–777, 233 *N.W.*2d 372, 377 (Sup.Ct.1975) (recognition of cause of action for medical treatment of child injured as result of rubella misdiagnosed in mother in early pregnancy). Those cases are consistent with New Jersey public policy that a physician should be liable for losses proximately caused by his negligent deprivation of a woman's right to decide whether or not to bear a child. *Berman, supra*, 80 *N.J.* at 431–432. The medical expenses attributable to the cystic fibrosis of their son are part of Mr. and Mrs. Schroeder's loss caused by the deprivation of their right to choose whether to conceive a second child. If it is proved at trial that the defendant physicians deprived Mr. and Mrs.

Schroeder of their right to choose whether or not to give birth to a child afflicted with cystic fibrosis, defendants should be liable for the incremental medical costs of a child born with that affliction. In the changing landscape of family torts our decision in this case merely advances the frontier a little farther.

We reverse the partial summary judgment for defendants on the third count of the complaint and remand the matter for trial.

SCHREIBER, J., dissenting.

The majority implicitly clings to the rule that there is no cause of action for "wrongful life," but its reasoning completely undercuts the rule's *raison d'etre*. It accepts the thesis that the infant has no cause of action based on whether he or she should not have been born. It accepts the public policy that the child's existence outweighs any discomfort the parents might endure in rearing and caring for the child. The consequence of adopting these propositions is that the parents can have no claim for medical expenses unless they are injured in their own right. Conversely, once the parents are held to have such a claim, it follows logically and conceptually that the child should be entitled to recover for its incapacity and the parents for the added costs in rearing the child.

It is well established that parents' claims for medical expenses incurred in curing and caring for their child depend on the liability of the third person to the child. See *Orr v. Orr*, 36 *N.J.* 236 (1962); *Berry v. Berry*, 120 *N.J.Super.* 452 (App.Div.1972); *Vanhorn v. Freeman*, 6 *N.J.L.* 322 (Sup.Ct.1796). This condition precedent is logical, sound and just. It is self-evident.

It is necessary to understand that the direct right which *Berman v. Allan*, 80 *N.J.* 421, 432 (1979), endorsed was enunciated in Chief Justice Weintraub's dissenting opinion in *Gleitman v. Cosgrove*, 49 *N.J.* 22, 64–65 (1967). This right, belonging to the mother, was her option to accept or reject a parental relationship with the child. Denial of that option constituted the breach. The damages caused by the breach were those flowing

from the emotional impact upon becoming aware of the denial of that option. They did *not* include medical expenses.[1] The Chief Justice explained:

> But there is an injury to the mother, and the question is whether a claim for the infant's cure and care can be said to flow from that injury. Even though there is an obvious connection between the loss of the option to abort and those costs, it seems to me that the parent's claim for the infant's cure and care must ultimately presuppose it would have been to the child's own interest not to have been born. The claim for cure and care is the child's, whether it is asserted on the child's behalf against a wrongdoer or against the mother or father or anyone else who in law must furnish it, and when a parent seeks to shift that burden to a tortfeasor, it must be, I think, upon the premise that the tortfeasor did a wrong to the child. If the child's estate bore the cost of cure and care as in some cases it might, the child could not recover that cost from the physician for the reason already given. It would be anomalous to say that a physician, although not liable to an infant who incurred that dollar loss, must pay for it when someone else, whether father, mother, other relative, or the State itself, incurs the expense. [49 *N.J.* at 64]

I would affirm.

HANDLER, J., concurring in part, dissenting in part.

I join with the majority of the Court, as I did in *Berman v. Allan*, 80 *N.J.* 421, 434–446 (1979), in recognizing and extending relief available to the aggrieved parents in this type of medical malpractice case. However, I disagree with the majority, again as I did in *Berman*, first, for failing to appreciate fully the nature of the cause of action and the character and extent of the injuries of such parents; and second, for failing to recognize, independently, the injuries and right of redress of the infant plaintiff. In expressing my views separately, however, I want to emphasize that I strongly endorse the Court's extension of its holding in *Berman* and its exposition of a rationale which, I believe, can more completely vindicate the interests of the victimized parents and child—the family—who have been wronged by the medical malpractice.

---

[1]*Berman* expressly rejected plaintiffs' claims for medical expenses and traced Chief Justice Weintraub's rationale holding that damages were to be measured in terms of the emotional stress caused by loss of the option to accept or reject a parental relationship. 80 *N.J.* at 432–433.

## I

The wrongful conduct of a physician, in contexts such as are present here, is a tort to the entire family. A doctor's wrongdoing, which directly leads to the otherwise avoidable conception and birth of a gravely congenitally handicapped infant, can be considered no less than a wrong to all who comprise the family unit. The Court itself recognizes that concept in this case, *viz*:

A family is woven of the fibers of life; if one strand is damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a web of interconnected legal interests. This Court has recognized that a wrongdoer who causes a direct injury to one member of the family may indirectly damage another. . . .

A physician's duty thus may extend beyond the interests of a patient to members of the immediate family of the patient who may be adversely affected by a breach of that duty.

[*Ante* at 63, 64.]

This very thought was expressed in the dissenting opinion of Justice Jacobs in *Gleitman v. Cosgrove*, 49 *N.J.* 22, 50 (1967), who stated: "While the wrong was done directly to Mrs. Gleitman, in truth and reality it vitally affected her entire immediate family." It was the germ of the dissenting opinion in *Berman* which emphasized that the physician's malpractice against the parents "encompass[es] the child" and that the "breach of [the physician's] duty affects both." 80 *N.J.* at 444.

The nature of this tort is unique; it impacts upon an entire family, both individually and collectively, and causes suffering peculiarly affecting one and all. The Court in *Berman* recognized in some measure the familial nature of the tortious injury when it overruled *Gleitman* and gave primary emphasis, by way of damages, to the mental anguish and emotional suffering of the parents attributable to the "wrongful birth" of their child arising out of physician misconduct.

While agreeing with the Court in *Berman*, I deemed it important to underscore additional components of such parental grief—the "moral affront"—that is suffered by parents upon their realization that they have been deprived of free will or moral choice in connection with so vital a matter as whether to

bring a handicapped child into the world. 80 *N.J.* at 439–440. Also, I explicitly recognized that the injury to familial relationships occasioned by this kind of medical negligence must entail an appreciation that the parents, by their mental and emotional anguish and their moral conflict, have been diminished in their role as parents—"impaired parenthood". *Id.* at 440–441. I continue to believe that it is important to emphasize that these factors are a real dimension of parental suffering and an essential part of any award of damages for this kind of malpractice.

In this case, then, I readily join my colleagues in reversing the decision of the Appellate Division and remanding this matter to the trial court to enable the parents to recover for the special medical expenses entailed in the care of their child, Thomas, as well as mental and emotional damages, inclusive of the element of moral injury or harm.

## II

I would also hold in this case that the child, whose parents lacked proper medical advice and were wrongfully deprived of the moral choice of whether to conceive or bear a genetically defective child, should be able to obtain damages from a delinquent physician to the extent the child shares the familial injuries and has suffered harm beyond that of the parents.

One aspect of the family tort is most clearly suffered by the child alone—that which is derived or flows from impaired parental capacity of the parents caused by physician dereliction. This harm to the child might be thought of as impaired or diminished childhood.

As I stated in my dissent in *Berman,*

Mental, emotional and moral suffering can involve diminished parental capacity. Such incapacity of the mother and father *qua* parents is brought about by the wrongful denial of a reasonable opportunity to learn of and anticipate the birth of a child with permanent defects, and to prepare for the heavy obligations entailed in rearing so unfortunate an individual. Such parents may experience great difficulty adjusting to their fate and accepting the child's impairment as nature's verdict. Wolfensberger & Menolascino, "A Theoretical Framework for the Management of Parents of the Mentally Retarded," *supra* at 479. While

some individuals confronted by tragedy respond magnificently and become exemplary parents, others do not. See, *e. g., Becker v. Schwartz*, 46 *N.Y.2d* 401, 413 *N.Y.S.2d* 895, 386 *N.E.2d* 807 (Ct.App.1978) in which the parents subsequently put their mongoloid child up for adoption, *N.Y. Times*, Feb. 17, 1979, at 23, col. 1. Individuals, suffering this form of parental incapacity or dysfunction are denied to a great extent the fuller joys, satisfaction and pride which comes with successful and effective parenting. This may endure for some time during the early developmental years of the child. [80 *N.J.* at 440–441]

The recognition of this cause of action is based upon the view that

[a]n adequate comprehension of the infant's claims under these circumstances starts with the realization that the infant has come into this world and is here, encumbered by an injury attributable to the malpractice of the doctors ... [He suffers] a diminished childhood in being born of parents ... who, on ... account [of the malpractice] were less fit to accept and assume their parental responsibilities. [*Id.* at 442]

Yet, many courts and commentators have, understandably, betrayed wariness, if not skepticism, in treading this area, seemingly deterred or discouraged by concerns over causation, the riddle—self-imposed, I would add—of comparing non-life to life itself, and the problem of duplicating damages. See, *e. g., Elliott v. Brown*, 361 *So.2d* 546 (Ala.S.Ct.1978); *Becker v. Schwartz*, 46 *N.Y.2d* 401, 413 *N.Y.S.2d* 895, 386 *N.E.2d* 807 (1978); *Speck v. Finegold*, 268 *Pa.Super.* 342, 408 *A.2d* 496 (1979); Comment, 63 *Marq.L.Rev.* 611 (1980); Cohen and LaCava "Actions for Unwanted Births" *For the Defense*, Vol. 23, No. 5 (May 1981). Laudably, some courts and commentators, however, have started to accept the thesis that a child in this blighted family situation is entitled to some recovery for its own injuries. *Curlender v. Bio-Science Laboratories*, 106 *Cal.App.3d* 811, 165 *Cal.Rptr.* 477 (1980); Note, 53 *Temple L.Q.* 176, 187; Editorial, " 'Wrongful Life'—the Label that Traps: *Gleitman* and *Berman* Revisited," 107 *N.J.L.J.* 260 (May 26, 1981).

Part, certainly not all, of the difficulties encountered by courts in this area inhere in the language employed to describe and analyze the legal issues. The connotations conjured by the popular or handy reference, "wrongful life," confuse and confound rather than enlighten. Whether the infant's cause of action be called wrongful life or, somewhat more aptly, "dimin-

ished life," is not the point. What is important is to recognize the existence of a form of suffering to the infant affecting the quality of its life, an incremental harm that adds to the great weight of the natural affliction it already bears. Courts, therefore, should not step into semantic quicksand or be trapped by labels that block insight into the rightness of this cause of action. Editorial, *supra*, 107 *N.J.L.J.* at 260.

As I stated in *Berman v. Allan, supra*, 80 *N.J.* at 441–446, the perceived analytical roadblocks to the recognition of infant recoveries based upon a diminished life or childhood, *ante* at 75, are, if not illusory, at least surmountable. First, recognizing the harm and measuring damages in terms of impaired childhood is based on a clear causal connection with the underlying tort. Diminished parental capacity, and its functional counterpart in the child—impaired childhood—to the extent they exist, are directly attributable to the deprivation of the parents' moral choice, their resultant grief and anguish and their lessened ability to cope with the rearing of a defective child—all traceable to the malfeasance of the errant physician. Second, no measure of life versus non-life is required. Rather, an injury to the existing child is merely being recompensed. The action recognizes that the afflicted child "is here, [further] encumbered by an injury attributable to the malpractice of the doctors." *Id.* 80 *N.J.* at 442. Finally damages awarded to the child need not be duplicative of those obtained by the parents. While the overall harm casts a pall upon the entire family, the injury to the child in the form of an impaired childhood is peculiar to the child and is analytically distinct from that harm suffered by the parents, although the two are interrelated. To the extent the child has suffered harm beyond that of the parents, damages to the child redress a separate wrong.

The identification and measure of damages for this cause of action, concededly, is elusive and complex, involving sensitive and subtle judgments. We have not hesitated to impose on fact finders tasks of comparable difficulty. *E. g., Green v. Bittner*, 85 *N.J.* 1 (1980); *Portee v. Jaffee*, 84 *N.J.* 88 (1980); *Berman v.*

*Allan, supra.* Moreover, even where the pitfalls of measuring damages have been genuine, we have not refused to grapple with the complexities in order to recognize the justness and fairness of relief. *Green v. Bittner, supra.* We should not shrink from what is right in this case.

I believe that what I am urging as a cognizable cause of action on behalf of the hapless ·child in this situation is not inconsistent with the philosophy of the Court expressed in the case it decides today. The familial nature of the tort is acknowledged. We have given voice to the common understanding that the physician's professional duty and responsibility, in treating a patient in matters involving procreation, pregnancy and childbirth, extend to that person not simply as an individual but as a member of a family whose entire welfare is bound up in the patient's health and well-being.

Unfortunately, the Court has not seen fit to comment further upon this aspect of the case relating to the child's cause of action, apparently because it does not view that claim as within the ambit of the issues on appeal. The infant's claim, however, is fully implicated by the Court's decision and reasoning and should be confronted.

While the plaintiffs, upon the dismissal of the fourth count of their complaint seeking damages for the infant Thomas, did not further challenge the adverse decision of the Appellate Division, this was fully understandable in light of the then-existing law expressed in *Berman v. Allan, supra* which appeared to foreclose such relief. Nevertheless, by our decision today, solely as a result of plaintiffs' appeal, the Court has now come to recognize more completely the familial nature of the malpractice tort in the wrongful birth and life context. The Court's conceptualization and definition of the tort, in my estimation, would readily encompass and accommodate a cause of action on behalf of the child. Plaintiffs in this suit should not be shorn of the deserved fruits of their diligent and successful efforts in achieving this result and in extending the frontiers of the law in this "chang-

ing landscape of family torts." *Ante* at 71. The Court frustrates plaintiffs, however, because the technical and inadvertent state of the appellate pleadings does not explicitly present the infant's claim. Since the matter comes to us on partial summary judgment and is now to be remanded for a full trial and adjudication upon the merits, I would allow plaintiffs leave to pursue all of their causes of action in light of the Court's rationale as to the nature of the tortious injury.

Accordingly, on remand, I would reinstate the "diminished" or "wrongful" life claim on behalf of the infant as set forth in the fourth count of the complaint, as well as the claim for medical expenses sought in the third count allowed by this Court.

*For reversal and remandment*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, HANDLER and POLLOCK—6.

*For affirmance*—Justice SCHREIBER—1.