291 N.J. Super. 619 (1996)
677 A.2d 1188
DONNA SAFER AND ROBERT SAFER, PLAINTIFFS-APPELLANTS,
v.
THE ESTATE OF GEORGE T. PACK; HELEN W. PACK; GEORGE T. PACK, JR.; CHRISTOPHER CHARLES PACK; MALCOLM JONATHAN PACK; TACY DOROTHEA PACK; AND CLYTIE HELEN PACK, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1996.
Decided July 11, 1996.
*621 Before Judges A.M. STEIN, KESTIN and CUFF.
Jeffrey A. Donner argued the cause for appellants (Shain, Schaffer & Rafanello, attorneys; Mr. Donner, of counsel, and, with Todd R. Staretz, on the brief).
Nancy Crosta Landale argued the cause for respondents (McDonough, Korn, Eichhorn & Boyle, attorneys; R. Scott Eichhorn, of counsel; Ms. Landale, on the brief).
The opinion of the court was delivered by KESTIN, J.A.D.
Plaintiffs appeal from the trial court's order dismissing their complaint and denying their cross-motion for partial summary judgment as to liability only. We reverse that portion of the order dismissing the complaint and affirm the denial of plaintiffs' motion.
Donna Safer's claim arises from the patient-physician relationship in the 1950s and 1960s between her father, Robert Batkin, a resident of New Jersey, and Dr. George T. Pack, also a resident of New Jersey, who practiced medicine and surgery in New York City and treated Mr. Batkin there. It is alleged that Dr. Pack specialized in the treatment and removal of cancerous tumors and growths.
In November 1956, Mr. Batkin was admitted to the hospital with a pre-operative diagnosis of retroperitoneal cancer. A week later, Dr. Pack performed a total colectomy and an ileosigmoidectomy for multiple polyposis of the colon with malignant degeneration in one area. The discharge summary noted the finding in a pathology report of the existence of adenocarcinoma developing in an intestinal polyp, and diffuse intestinal polyposis "from one end *622 of the colon to the other." Dr. Pack continued to treat Mr. Batkin postoperatively.
In October 1961, Mr. Batkin was again hospitalized. Dr. Pack performed an ileoabdominal perineal resection with an ileostomy. The discharge summary reported pathology findings of "ulcerative adenocarcinoma of colon Grade II with metastases to Levels II and III" and "adenomatous polyps." Dr. Pack again continued to treat Mr. Batkin postoperatively. He also developed a physician-patient relationship with Mrs. Batkin relative to the diagnosis and treatment of a vaginal ulcer.
In December 1963, Mr. Batkin was hospitalized once again at Dr. Pack's direction. The carcinoma of the colon had metastasized to the liver with secondary jaundice and probable retroperitoneal disease causing pressure on the sciatic nerve plexus. After some treatment, Mr. Batkin died on January 3, 1964, at forty-five years of age. Donna was ten years old at the time of her father's death. Her sister was seventeen.
In February 1990, Donna Safer, then thirty-six years of age and newly married, residing in Connecticut, began to experience lower abdominal pain. Examinations and tests revealed a cancerous blockage of the colon and multiple polyposis. In March, Ms. Safer underwent a total abdominal colectomy with ileorectal anastamosis. A primary carcinoma in the sigmoid colon was found to extend through the serosa of the bowel and multiple polyps were seen throughout the entire bowel. Because of the detection of additional metastatic adenocarcinoma and carcinoma, plaintiff's left ovary was also removed. Between April 1990 and mid-1991, Ms. Safer underwent chemotherapy treatment.
In September 1991, plaintiffs obtained Robert Batkin's medical records, from which they learned that he had suffered from polyposis. Their complaint was filed in March 1992, alleging a violation of duty (professional negligence) on the part of Dr. Pack in his failure to warn of the risk to Donna Safer's health.
*623 Plaintiffs contend that multiple polyposis is a hereditary condition that, if undiscovered and untreated, invariably leads to metastatic colorectal cancer. They contend, further, that the hereditary nature of the disease was known at the time Dr. Pack was treating Mr. Batkin and that the physician was required, by medical standards then prevailing, to warn those at risk so that they might have the benefits of early examination, monitoring, detection and treatment, that would provide opportunity to avoid the most baneful consequences of the condition.
The summary judgment proceeding in the trial court was based upon a scanty record, largely comprised of hospital records. Dr. Pack himself had died in 1969; none of his individual records were before the court. The reports of the parties' medical experts and a deposition of plaintiffs' expert were submitted. Ida Batkin, Donna Safer's mother, had also given a deposition in which she testified, among other details, that neither her husband nor Dr. Pack had ever told her that Mr. Batkin suffered from cancer; and that, throughout the courses of surgery and treatment, Dr. Pack advised her that he was treating a "blockage" or an unspecified "infection". On the one or two occasions when Mrs. Batkin inquired of Dr. Pack whether the "infection" would affect her children, she was told not to worry.
In dismissing, the trial court held that a physician had no "legal duty to warn a child of a patient of a genetic risk[.]" In the absence of any evidence whether Dr. Pack had warned Mr. Batkin to provide information concerning his disease for the benefit of his children, the motion judge "assume[d] that Dr. Pack did not tell Robert Batkin of the genetic disease."
The motion judge's reasoning proceeded from the following legal premise: "[i]n order for a doctor to have a duty to warn, there must be a patient/physician relationship or circumstances requiring the protection of the public health or the community [at] large." Finding no physician-patient relationship between Dr. Pack and his patient's daughter Donna, the court then held genetically transmissible diseases to differ from contagious or *624 infectious diseases or threats of harm in respect of the duty to warn, because "the harm is already present within the non-patient child, as opposed to being introduced, by a patient who was not warned to stay away. The patient is taking no action in which to cause the child harm."
The motion judge relied on Pate v. Threlkel, 640 So.2d 183 (Fla. Dist. Ct. App. 1994), as the only "on point" authority respecting genetically transmissible disease. In holding that a physician owed the patient's child no duty to warn, the Florida Court of Appeals had expressly rejected the general approach of the New Jersey Supreme Court in Schroeder v. Perkel, 87 N.J. 53, 63-65, 432 A.2d 834 (1981), on related questions of foreseeability and duty.
The Florida Supreme Court has since dealt with the issue, reaching a contrary conclusion. Pate v. Threlkel, 661 So.2d 278 (1995). Because the case had initially been decided on defendants' motions to dismiss the complaint for failure to state a cause of action, the Supreme Court was required to
accept as true the [plaintiffs'] allegations that pursuant to the prevailing standard of care, the health care providers were under a duty to warn [the patient] of the importance of testing her children for [the genetically transmissible] carcinoma.
[Id. at 281.]
The court held:
[W]hen the prevailing standard of care creates a duty that is obviously for the benefit of certain identified third parties and the physician knows of the existence of those third parties, then the physician's duty runs to those third parties. Therefore, in accord with our decision in Baskerville-Donovan Engineers, [Inc. v. Pensacola Executive House Condominium Ass'n, 581 So.2d 1301 (Fla. 1991)], we hold that privity does not bar Heidi Pate's pursuit of a medical malpractice action. Our holding is likewise in accord with McCain [v. Florida Power Corp., 593 So.2d 500 (Fla. 1992)] because under the duty alleged in this case, a patient's children fall within the zone of foreseeable risk.
* * * Our holding should not be read to require the physician to warn the patient's children of the disease. In most instances the physician is prohibited from disclosing the patient's medical condition to others except with the patient's permission. See § 455.241(2), Fla. Stat. (1989). Moreover, the patient ordinarily can be expected to pass on the warning. To require the physician to seek out and warn various members of the patient's family would often be difficult or impractical *625 and would place too heavy a burden upon the physician. Thus, we emphasize that in any circumstances in which the physician has a duty to warn of a genetically transferable disease, that duty will be satisfied by warning the patient.
[Pate v. Threlkel, supra, 661 So.2d at 282.]
Because the issue before us arose on a motion for summary judgment, we, too, are obliged to accept plaintiffs' proffer through their medical expert that the prevailing standard of care at the time Dr. Pack treated Mr. Batkin required the physician to warn of the known genetic threat. The legal standard of care, knowledge and skill is that which is "ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field." Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964). Whether the conduct of a practitioner in established circumstances at a particular time comported with prevailing standards of care is preeminently a question to be determined by the finder of fact, not an issue of law to be resolved by the court. Campo v. Tama, 133 N.J. 123, 133, 627 A.2d 135 (1993); Lopez v. Swyer, 115 N.J. Super. 237, 251, 279 A.2d 116 (App.Div. 1971), aff'd, 62 N.J. 267, 300 A.2d 563 (1973). Where, as here, a genuine issue of fact in this regard is presented, the matter is not amenable to resolution on summary judgment. R. 4:46-2, Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 528-30, 536-37, 666 A.2d 146 (1995); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-77, 110 A.2d 24 (1954); R. 4:46-2.
Whether a legal duty exists is, however, a matter of law. Strawn v. Canuso, 271 N.J. Super. 88, 100, 638 A.2d 141 (App.Div. 1994), aff'd, 140 N.J. 43, 657 A.2d 420 (1995). We see no impediment, legal or otherwise, to recognizing a physician's duty to warn those known to be at risk of avoidable harm from a genetically transmissible condition. In terms of foreseeability especially, there is no essential difference between the type of genetic threat at issue here and the menace of infection, contagion or a threat of physical harm. See generally, e.g., McIntosh v. Milano, 168 N.J. Super. 466, 483-85, 403 A.2d 500 (Law Div. 1979); Tarasoff v. *626 Regents of Univ. of Cal., 17 Cal.3d 425, 131 Cal. Rptr. 14, 24, 551 P.2d 334, 344 (1976); Restatement (Second) of Torts §§ 314, 314A (1965); T.A. Bateman, Annotation, Liability of Doctor or Other Health Practitioner to Third Party Contracting Contagious Disease from Doctor's Patient, 3 A.L.R. 5th 370 (1992). The individual or group at risk is easily identified, and substantial future harm may be averted or minimized by a timely and effective warning.
The motion judge's view of this case as one involving an unavoidable genetic condition gave too little significance to the proferred expert view that early monitoring of those at risk can effectively avert some of the more serious consequences a person with multiple polyposis might otherwise experience. We cannot conclude either, as the trial court did, that Dr. Pack breached no duty because avoidable harm to Donna was not foreseeable, i.e., "that Dr. Pack's conduct did not create a `foreseeable zone of risk.'" Such a determination would ignore the presumed state of medical knowledge at the time. It would also tend to undervalue the concepts that inform our case law establishing a cause of action for increased risk of harm, see Evers v. Dollinger, 95 N.J. 399, 412-17, 471 A.2d 405 (1984); see also Fischer v. Canario, 143 N.J. 235, 241-43, 670 A.2d 516 (1996); Scafidi v. Seiler, 119 N.J. 93, 108-09, 574 A.2d 398 (1990), as well as the underlying rationale of our rules of law on foreseeability, heretofore held to be specifically applicable in professional negligence cases involving genetic torts. See Schroeder v. Perkel, supra, 87 N.J. at 63-64, 432 A.2d 834.
Although an overly broad and general application of the physician's duty to warn might lead to confusion, conflict or unfairness in many types of circumstances, we are confident that the duty to warn of avertible risk from genetic causes, by definition a matter of familial concern, is sufficiently narrow to serve the interests of justice. Further, it is appropriate, for reasons already expressed by our Supreme Court, id. at 63-65, 432 A.2d 834, that the duty be seen as owed not only to the patient himself but that it also "extend[s] beyond the interests of a patient to members of the *627 immediate family of the patient who may be adversely affected by a breach of that duty." Id. at 65, 432 A.2d 834; cf. Fosgate v. Corona, 66 N.J. 268, 274, 330 A.2d 355 (1974) (patient's daughter-in-law and grandchildren, all members of her household but apparently not, themselves, defendant physician's patients, were entitled to recover for contracting tuberculosis as a result of defendant's malpractice in failing to diagnosis the disease in his patient). We need not decide, in the present posture of this case, how, precisely, that duty is to be discharged, especially with respect to young children who may be at risk, except to require that reasonable steps be taken to assure that the information reaches those likely to be affected or is made available for their benefit. We are aware of no direct evidence that has been developed concerning the nature of the communications between physician and patient regarding Mr. Batkin's disease: what Dr. Pack did or did not disclose; the advice he gave to Mr. Batkin, if any, concerning genetic factors and what ought to have been done in respect of those at risk; and the conduct or expressed preferences of Mr. Batkin in response thereto. There may be enough from Mrs. Batkin's testimony and other evidence for inferences to be drawn, however.
We decline to hold as the Florida Supreme Court did in Pate v. Threlkel, supra, 661 So.2d at 282, that, in all circumstances, the duty to warn will be satisfied by informing the patient. It may be necessary, at some stage, to resolve a conflict between the physician's broader duty to warn and his fidelity to an expressed preference of the patient that nothing be said to family members about the details of the disease. We cannot know presently, however, whether there is any likelihood that such a conflict may be shown to have existed in this matter or, if it did, what its qualities might have been. As the matter is currently constituted, it is as likely as not that no such conflict will be shown to have existed and that the only evidence on the issue will be Mrs. Batkin's testimony, including that she received no information, despite specific inquiry, that her children were at risk. We note, in addition, the possible existence of some offsetting evidence that *628 Donna was rectally examined as a young child, suggesting that the risk to her had been disclosed.
This case implicates serious and conflicting medical, social and legal policies, many aptly identified in Sonia M. Suter, Whose Genes Are These Anyway? Familial Conflicts Over Access to Genetic Information, 91 Mich. L.Rev. 1854 (1993) and in other sources, including some referred to by the motion judge. Some such policy considerations may need to be addressed in ultimately resolving this case. For example, if evidence is produced that will permit the jury to find that Dr. Pack received instructions from his patient not to disclose details of the illness or the fact of genetic risk, the court will be required to determine whether, as a matter of law, there are or ought to be any limits on physician-patient confidentiality, especially after the patient's death where a risk of harm survives the patient, as in the case of genetic consequences. See generally Janet A. Kobrin, Confidentiality of Genetic Information, 30 UCLA L.Rev. 1283 (1983).
Issues of fact remain to be resolved, as well. What was the extent of Donna's risk, for instance? We are led to understand from the experts' reports that the risk of multiple polyposis was significant and that, upon detection, an early full colectomy, i.e., an excision of her entire colon, may well have been the treatment of choice to avoid resultant cancer  including metastasis, the loss of other organs and the rigors of chemotherapy. Full factual development may, however, cast a different light on these issues of fact and others.
Difficult damage issues portend also. Not the least of these will involve distinguishing between the costs of the medical surveillance that would have followed a timely and effective warning, and the costs of medical care attributable to any breach of duty that may be found to have occurred. See Lanzet v. Greenberg, 126 N.J. 168, 188, 594 A.2d 1309 (1991).
Because of the necessarily limited scope of our consideration, we have highlighted only a few of the potentially troublesome issues presented by this case. Such questions are best conceived and *629 considered in the light of a fully developed record rather than in the abstract.
Although not raised by either party on appeal, it is also possible that, in resolving this case, the trial court will be called upon to determine whether and to what extent the law of the State of New York should apply rather than that of New Jersey. All of the medical services at the heart of plaintiffs' claims were rendered in New York City. Questions remain regarding when and where, as a matter of law, the tort of which plaintiffs complain was committed, and what effect the answers may have as to choice of law, see, e.g., Restatement (Second) of Conflict of Laws §§ 145, 146, 159, 163 (1971), a determination to be made on an issue by issue basis applying the flexible governmental interest analysis approach. Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986); Grossman v. Club Med Sales, Inc., 273 N.J. Super. 42, 48-49, 640 A.2d 1194 (App.Div. 1994). Of course, if no issues of conflict of laws or the need to apply foreign law are raised, New Jersey law will continue to govern. Veazey v. Doremus, supra, 103 N.J. at 248, 510 A.2d 1187; Graulich Caterer, Inc. v. Hans Holterbosch, Inc., 101 N.J. Super. 61, 67, 243 A.2d 253 (App.Div. 1968).
The order of the trial court dismissing the complaint is reversed. For similar reasons, the trial court's order denying plaintiffs' motion for summary judgment on liability is affirmed. The matter is remanded to the trial court for further proceedings.