Dwight A. PHILLIPS and Kathleen E.
Phillips, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

William Randall PHILLIPS, by his
Guardian ad Litem, Dwight A.
PHILLIPS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 79–551–8, 79–553–8.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 7, 1981.

Ellis I. Kahn, Charleston, S.C., for plaintiffs.

Henry Dargan McMaster, U.S. Atty., Columbia, S.C., for defendant.

**2**

## ORDER

BLATT, District Judge.

This matter is before the court for final disposition of the issue of liability in plaintiffs' consolidated medical malpractice actions against the United States, which were brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80. This court has previously addressed certain aspects of these claims, denying defendant's motion for summary judgment of the parental claim for "wrongful birth," *Phillips v. United States,* 508 F.Supp. 544 (D.S.C.1981), and granting defendant's motion for summary judgment of the filial claim for "wrongful life,"[1] *Phillips v. United States,* 508 F.Supp. 537 (D.S.C.1980). Briefly, plaintiffs contend that the staff of the Naval Regional Medical Center (NRMC) in Charleston, South Carolina, breached the applicable standard of medical care by failing to advise, counsel, and test the parents concerning the risk that their offspring would be afflicted with Down's syndrome, commonly known as mongolism, and by failing to diagnose and treat a cardiac disorder in the newborn child. Testimony on the various issues raised by plaintiffs' claims was heard by this court on December 15, 16, and 17, 1980. After a thorough review of this testimony, as well as the numerous exhibits introduced by the parties, this court hereby renders its findings of fact and conclusions of law pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### A. Background

1. Kathleen D. Phillips was born on February 4, 1954, to Archie and Loretta May.

Transcript at 4. Mrs. Phillips' older sister, Rhonda May, was afflicted with Down's syndrome.[2] *Id.* at 8–9, 44–46, 157. In 1974, Mrs. Phillips married Dwight A. Phillips, *id.* at 5; at all times pertinent to the causes herein, Mr. Phillips was on active duty with the United States Navy stationed in Charleston, South Carolina. *Id.* at 7.

2. William Randall Phillips is the son of Dwight A. Phillips and Kathleen D. Phillips; he was born on September 23, 1977, at the NRMC. *Id.* at 18; Plaintiff's Exhibit 1. It was noted shortly after his birth that the child was afflicted with Down's syndrome, as well as a moderately loud heart murmur. Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 6; Pl. Ex. 7.

### B. Parental Claim for Wrongful Birth

#### (1) Treatment at the NRMC

3. On August 9, 1976, during a previous pregnancy, Mrs. Phillips made her initial visit to the obstetrics clinic at the NRMC. In completing a prenatal questionnaire form at the clinic, she indicated, among other information, that she was twenty-two years of age, that she had not previously borne any children, and that her sister was "mentally retarded." Transcript at 7; Pl. Ex. 1. The clinical record form for that visit, completed by the attending physician, also reflects the patient's family history of mental retardation.[3] Pl. Ex. 1; Pl. Ex. 3. No further information concerning the circumstances or ramifications of this family history was solicited from Mrs. Phillips by the clinical staff. Transcript at 10. On August 15, 1976, Mrs. Phillips returned to

---

1. Although the court rejected the infant plaintiff's wrongful life claim, his claim for neonatal medical malpractice survived defendant's summary judgment motion. *Phillips v. United States,* 508 F.Supp. 537, 544 (D.S.C.1980).

2. Down's Syndrome has been defined by one medical authority as

   a syndrome of mental retardation associated with a variable constellation of abnormalities caused by representation of at least a critical portion of chromosome 21 three times instead of twice in some or all cells; ... the abnormalities include retarded growth, hypoplastic face with short nose, prominent epi-

canthic skin folds, protruding lower lip, small rounded ears with prominent antihelix, fissured and thickened tongue, laxness of joint ligaments, pelvic dysplasia, broad hands and feet, stubby fingers ... dry rough skin in older patients and abundant slack neck skin in newborn....

Stedman's Medical Dictionary 1382 (4th unabr. lawyer's ed. W. Dornette 1976).

3. Additionally, the medical records of Mrs. Phillips' sister, Rhonda May, were available at the NRMC. Pl. Ex. 15; Pl. Ex. 16.

the NRMC complaining of cervical bleeding and abdominal cramps; while at the emergency room, Mrs. Phillips experienced an incomplete spontaneous abortion, for which she was hospitalized and treated with a therapeutic dilatation and curettage of the uterine cervix by Dr. Louis Weinstein. Transcript at 7; Pl. Ex. 1; Pl. Ex. 3; Pl. Ex. 19.

4. Mrs. Phillips became pregnant again in late December, 1976, and this pregnancy was confirmed by the Berkeley County Health Department toward the end of January, 1977. Transcript at 11. After experiencing some difficulty in obtaining an appointment at the NRMC, *id.* at 11–12, Mrs. Phillips returned to the obstetrics clinic on March 22, 1977. *Id.* at 12–14; Pl. Ex. 1. In responding to a section on the prenatal questionnaire form concerning any family history of mental retardation, it was again noted that Mrs. Phillips' sister was afflicted with Down's syndrome.[4] Transcript at 13–14; Pl. Ex. 1. The prenatal questionnaire form also indicated that Mrs. Phillips' last menstrual period was December 14, 1976, and that she had previously experienced a miscarriage. Pl. Ex. 1. In addition to completing this form, Mrs. Phillips also gave blood and urine samples for preliminary lab work and watched some informational films on pregnancy, prenatal care, and childbirth. Transcript at 13–14, 47. No further inquiry concerning the patient's family history of Down's syndrome was made by the clinical staff during the March, 1977, appointment. *Id.* at 15.

5. On April 17, 1977, Mrs. Phillips returned to the obstetrics clinic for an appointment; she was examined by Dr. Robert K. Sadler, who was at that time a second year resident in obstetrics and gynecology at the Medical University of South Carolina (MUSC) on a three month rotation

at the NRMC. Transcript at 15, 231–33; Pl. Ex. 1. According to Dr. Sadler, the purpose of that appointment "was ... primarily to receive both a history and physical examination ...." *Id.* at 233. The clinical record form, which was completed and signed by Dr. Sadler during that visit, indicated that the patient's family history included a sister with Down's syndrome. Transcript at 15, 234, 241–42; Pl. Ex. 1. Despite his awareness of this aspect of Mrs. Phillips' family history, Dr. Sadler made no further inquiry concerning the sister's affliction and, more importantly, he made no attempt to explain to Mrs. Phillips the possible implications of this history to her offspring or to advise her of the availability of prenatal testing procedures, particularly amniocentesis.[5] Transcript at 15, 234–35.

6. Between April and September, 1977, Mrs. Phillips returned to the NRMC approximately eleven times, mostly for routine appointments. Transcript at 16; Pl. Ex. 1. The only problems noted on the clinical record form concern hypertension and nausea. Pl. Ex. 1. There is some evidence that Mrs. Phillips again mentioned her family history of Down's syndrome during a visit to the obstetrics clinic in May, 1977. Transcript at 16, 31. During this period, Mrs. Phillips did not receive any counseling concerning the genetic basis of Down's syndrome, the increased possibility that the defect could appear in her offspring, or the availability of prenatal testing procedures to determine whether the fetus was so afflicted. Transcript at 15–17. *See* Pl. Ex. 1.

7. Mrs. Phillips was admitted to the NRMC by Dr. Wayne R. Kaniewski on September 22, 1977, and she gave birth to her son, William Randall Phillips, the next day. Pl. Ex. 1; Pl. Ex. 4; Pl. Ex. 21 at 4–5. During delivery, "the patient began to reveal severe fetal distress and it was felt

---

4. The notation on that section of the form read: "Sister (Downs Syndrome)." Pl.Ex. 1. The testimony at trial indicated that Mrs. Phillips' mother, Mrs. May, accompanied her daughter to the appointment and filled out that section while Mrs. Phillips gave blood and urine samples. Transcript at 14, 47.

5. The primary prenatal testing procedure that defendant failed to perform is an amniocentesis test, in which a small amount of the amniotic fluid surrounding the fetus is extracted and analyzed for chromosomal abnormalities. Transcript at 145; Pl.Ex. 20 at 22–23. *See Phillips v. United States,* 508 F.Supp. 544, 547 n. 5 (D.S.C.1981).

that [a] caesarean section was indicated . . . [and t]he same was done . . ." by Dr. R.L. Anderson and Dr. William F. James, Jr. Pl. Ex. 4. Shortly after the child's birth, it was noted that he was apparently suffering from both Down's syndrome and a cardiac defect. Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 6; Pl. Ex. 7. The preliminary diagnosis of Down's syndrome was later confirmed by karyotypic analysis of the child's chromosomes by Dr. Ronald J. Jorgenson and John Felix Rogers. Pl. Ex. 2. Mrs. Phillips was notified of her child's condition by Dr. Anderson, who exhibited certain objective indicia of embarrassment when she informed him that her sister was similarly afflicted.[6] Transcript at 18–19.

8. Subsequent to Randy's birth, both Mrs. Phillips and her son were under the care of Dr. Robert R. Bass, a family practice resident at the NRMC. Transcript at 19–20, 69. In October and November, 1977, Dr. Bass ordered blood karyotypes of both Mrs. Phillips and Randy; these tests, performed by Dr. Jorgenson and Mr. Rogers at MUSC, revealed that the child suffered from the translocational variety of Down's syndrome[7] and that Mrs. Phillips was a carrier of this chromosomal translocation. Transcript at 75; Pl. Ex. 2. Dr. Bass' explanation of these tests was the first indication given to Mrs. Phillips that Down's syndrome could be an inheritable defect and that she could transmit the defect to her offspring. Transcript at 20–21, 75. *See* Finding of Fact 10. When questioned by Mr. Phillips concerning the failure of the NRMC to administer those tests earlier, Dr. Bass responded that the tests were expensive and could not be performed in every pregnancy. Transcript at 21–22, 56–57, 78.

9. On May 31, 1978, Mrs. Phillips was admitted to the NRMC for a tubal ligation, which was performed by Dr. David L. Williams. Transcript at 35–37, 76–77, 213–16; Pl. Ex. 5. The primary reason for this procedure was Mrs. Phillips' desire to avoid conceiving another child afflicted with Down's syndrome. Transcript at 36, 76–77, 214–15; Pl. Ex. 5.

10. Mrs. Phillips testified that, although she had known her sister's mental retardation was a result of Down's syndrome "[f]or about five years" prior to Randy's birth, Transcript at 9, she was not aware that Down's syndrome could be an inheritable disorder or that she could be a carrier of the defect. *Id.* at 9–10. This was corroborated by Mr. Phillips, *id.* at 54, and by Mrs. May, who had been informed that the disorder was the result of "a misplaced chromosome . . . [and] that it was a freak accident . . . [which] would never happen again." *Id.* at 46. *See id.* at 10. The evidence clearly established that neither Mr. Phillips nor Mrs. Phillips were aware of translocational Down's syndrome or the possibility that Mrs. Phillips could be a carrier of the defect; during the course of her prenatal care at the NRMC, they were never provided with that information, nor were they apprised of the availability of prenatal testing procedures, particularly amniocentesis, which could conclusively determine whether the fetus was afflicted with Down's syndrome.

11. Both Mr. Phillips and Mrs. Phillips testified that, in light of the potential risk of Down's syndrome, they would have requested prenatal testing had they been informed of its availability, Transcript at 25, 54, and that they would have elected to abort the fetus had they known that the child would be afflicted with Down's syndrome. *Id.* at 26, 37–38, 54–55. The court views this testimony as determinative of the issue of the parents' subjective intent; with respect to this issue, defendant's attempts to contradict the parents' testimony by eliciting testimony concerning their love for the afflicted child, *id.* at 34, 66–67, their desire to keep the child and not place him for adoption, *id.* at 35, 67, possible moral or religious objections to abortion, *id.* at 39–41,

---

6. Dr. Anderson's reaction to this information may constitute an admission under *Green v. Lilliewood*, 272 S.C. 186, 189–90, 249 S.E.2d 910, 911–12 (1978).

7. The distinction between translocational and nondisjunctive Down's syndrome will be discussed subsequently. See Finding of Fact 12.

61–63, 100–02, and Mrs. Phillips' decision to undergo a tubal ligation rather than risk the necessity of future abortions, *id.* at 35–39, 77–78, 213–16; see Finding of Fact 9, are neither persuasive nor germane.

### (2) Standard of Care

12. The crucial issue in the parental claim is whether, in light of Mrs. Phillips' positive family history of Down's syndrome, the failure of the staff at the NRMC to advise the parents of the potential risk to their offspring and the availability of prenatal testing procedures to determine the condition of the fetus constituted a breach of the applicable standard of care. As previously indicated, see note 2, *supra,* Down's syndrome is a chromosomal anomaly characterized by the appearance of a critical portion of chromosome 21 three times rather than twice; this condition can arise sporadically from a chromosomal nondisjunction during the process of meiosis that creates the maternal egg cell, an occurrence which increases significantly with advanced maternal age, or, less frequently, the condition can arise by the inheritance of an abnormal chromosome 14 onto which a portion of chromosome 21 has been fused through a process called translocation.[8] Transcript at 75, 155–57, 160–63, 188, 198–200, 210, 281–85; Pl. Ex. 19 at 15; Pl. Ex. 21 at 6. *See* Pl. Ex. 1; Pl. Ex. 2; Def. Ex. 1. The genetic basis of Down's syndrome "has been known ... since 1959 when it was first described as ... a chromosomal entity ...." Transcript at 188. The primary risk factors suggesting an increased possibility of Down's syndrome in potential offspring are advanced maternal age and prior afflicted children; however, a positive family history for that disorder also constitutes a pertinent risk factor. Transcript at 157, 159–64, 190–92, 195–96, 199–200, 208–09, 226, 235, 237–38, 276–77; Pl. Ex. 19 at 6, 18; Pl. Ex. 20 at 7–8, 10, 12–13; Pl. Ex. 21 at 6–7; Def. Ex. 1. Once the increased possibility of Down's syndrome has been sug-gested by a positive family history, testing procedures such as blood karyotyping can be performed on the potential mother and affected family members to determine whether the Down's syndrome at issue is the result of a 21/14 translocation, indicating an increased risk that future offspring will be affected.[9] Transcript at 75, 156–58, 161–63, 199–200, 295; Pl. Ex. 19, at 11–12, 14–16, 17–19; Pl. Ex. 20 at 9–10, 12–14, 15–17; Pl. Ex. 21, at 5–7, 8–9. *See* Pl. Ex. 1; Pl. Ex. 2. Moreover, during the mother's pregnancy, certain prenatal testing procedures are available to ascertain the condition of the fetus; the evidence clearly established that amniocentesis, see note 5, *supra,* was a well-recognized medical procedure in 1977 that could be utilized to determine, reliably and with minimal risk, whether a fetus was afflicted with some type of Down's syndrome. Transcript at 76, 169–71, 200–03, 239–40, 243–44, 245–64, 279–80, 305; Pl. Ex. 19 at 8–10, 11, 14; Pl. Ex. 20 at 22–23; Def. Ex. 1.

13. The evidence presented by plaintiff on the issue of the standard of care included the testimony of Dr. Robert R. Bass, Dr. Ronald J. Jorgenson, and Dr. George A. Maxwell. The depositions of Dr. Louis Weinstein, Dr. William F. James, Jr., and Dr. Wayne Kaniewski were submitted. Additional testimony from Dr. Jorgenson was also adduced in reply. Defendant presented the testimony of Dr. David L. Williams, Dr. Robert K. Sadler, Dr. Roger E. Stevenson, and John Felix Rogers.

14. Dr. Robert R. Bass, a resident in family practice at the NRMC from 1977 to 1979, supervised the progress of Mrs. Phillips and Randy after his birth. *See* Finding of Fact 8. Although Dr. Bass expressed some reluctance "to speak as an expert on the management of Down's syndrome ...," Transcript at 71, he testified that he became aware of amniocentesis during medical school, *id.* at 76–77, and that, as a family

---

8. Approximately three to five per cent of all cases of Down's syndrome are attributable to a 21/14 translocation. Transcript at 280; Pl.Ex. 19 at 25.

9. Conversely, with nondisjunctive Down's syndrome, there "would be ... no increased risk at all so far as having another affected child." Transcript at 282.

**6**

practice resident, he would have "contacted one of the OB attendings on a referral basis and asked him how to pursue the case at that point . . . [because] there could be some genetic involvement with respect to the mother perhaps having a type of chromosome that could possibly be transmitted to the child." *Id.* at 71–72.

15. Dr. Louis Weinstein, a specialist in obstetrics and gynecology (OB/GYN), was stationed at the NRMC between 1976 and 1978. Pl. Ex. 19. *See* Finding of Fact 3. In his deposition, Dr. Weinstein testified that genetic counseling was being performed at the NRMC during this time, *id.* at 6–7, that he and other staff members performed amniocenteses during this time, *id.* at 8–10, and that the OB/GYN residents were under the direct supervision of the OB/GYN staff. *Id.* at 10. Although Dr. Weinstein also expressed reluctance to comment on the standard of care, *id.* at 26–27, he indicated that the prenatal questionnaire form completed by Mrs. Phillips would have prompted him to "discuss with the patient the possibility of problems in the pregnancy. . . ." *Id.* at 17. This inquiry would include the nature of her sister's Down's syndrome, *id.* at 17–18, the possibility of her being a carrier, *id.* at 18, and the availability of amniocentesis. *See id.* at 19–20.

16. Dr. William F. James, Jr., an OB/GYN resident at MUSC between 1976 and 1980, was on a three month rotation at the NRMC at the time of Randy's birth. Pl. Ex. 20. *See* Finding of Fact 7. While Dr. James did not consider himself an expert, *id.* at 9, he testified in his deposition that, based upon the family history of Down's syndrome indicated by the prenatal questionaire, he would have obtained additional information concerning Mrs. Phillips' sister, provided further genetic counseling, and discussed the availability of amniocentesis. *Id.* at 9–10. Dr. James also testified that he would expect a second year OB/GYN resident to provide a patient who exhibited a positive family history for Down's syndrome with this information. *Id.* at 17.

17. Dr. Wayne R. Kaniewski, a family practice resident at the NRMC between 1977 and 1980, admitted Mrs. Phillips to the hospital on September 22, 1977; Dr. Kaniewski was the OB/GYN attending physician on duty when Mrs. Phillips arrived at the NRMC. Pl. Ex. 21. *See* Finding of Fact 7. In his deposition, Dr. Kaniewski testified that a positive family history of Down's syndrome would necessitate further genetic counseling and testing. *Id.* at 5–8. "[A] Down's child in the family would be an indication for further genetic counseling." *Id.* at 9.

18. Dr. George A. Maxwell was duly qualified as an expert in the medical specialty of obstetrics and gynecology. Transcript at 173–87. Dr. Maxwell testified that the standard of medical care applicable to an OB/GYN specialist or resident in 1977 would require additional genetic counseling and prenatal testing if the patient indicated a positive family history of Down's syndrome. *Id.* at 188–92.

Q. In the spring of 1977, what appreciation in terms of risk should an obstetrician such as you have described have had when a patient came in and said, "I have a sibling with a Downs Syndrome."

A. Well, the appreciation of the obstetrician is specifically this, immediately he knows that this person has a peculiar and significant problem, and he must do something about that specific problem. Now, he himself may or may not be thoroughly versed in genetics. That is not the obstetrician's job, to be the geneticist, but he must seek help. He knows that anybody that has a Downs in their family, they must find out what the risk for that person is, and there are techniques to do this, and his job as the obstetrician is to let that patient know that there are things that can be done and should be done in order to determine her risk.

\*      \*      \*      \*      \*      \*

Q. Doctor, if you assume, if you will, this is information reflected on Plaintiffs' Exhibit One, that a patient came in and filled out in March of 1977 a prenatal questionnaire reflecting "sister (Downs

Syndrome)" and had some blood work and tests and then subsequently saw a physician in his second year of his obstetric Residency, with that obstetric Residency being in a hospital that had a section of clinical genetics, and he wrote down as a positive finding in the chart, "sister with Downs Syndrome," and if he did nothing in response to that history by way of further inquiry or any referral other than simply to have written it down, do you have an opinion satisfactory to yourself based upon reasonable medical certainty as to whether or not there was a departure from the standard of care that was owed to that patient and the fetus?

A. There was definitely a departure from the usual customary obstetrical care with the failure to do something about this fact when it was known to him.

Q. All right. Well, let's assume for a moment generally that the physician is not tremendously well versed in genetics but simply understands that Downs Syndrome is a significant risk factor. What would the standard of care require that he do in the spring of 1977?

A. Being an obstetrician and you have specified that the man was a Resident, he should have gone to his immediate or some Senior and said, "I have a patient with a Downs history. What should be done?" If he didn't know what to do, if he himself did not know what to do, he should have sought advice and counsel immediately. He should have known that this was a serious and an important risk factor in this woman. If he's a second year Resident, he is not a trained or had thorough training in genetics, therefore, he could not function as the geneticist, but genetic counseling was available. He should have known that this woman deserved it and needed it promptly since she was pregnant and let the geneticist give the advice.

He also knew perfectly well at that stage of his training about the series of events that potentially could take place and probably would take place such as a thorough and proper family history in

regard to genetics, whether he took it or somebody else did; the technique of amniocentesis, he certainly knew existed, and he certainly knew where it could be obtained or done. He certainly knew that there was the possibility provided that the findings warranted it that this woman might choose not to have this child, and, therefore, he knew that there was the potential for interrupting this pregnancy, if that were indicated and if the woman chose. In other words, she had options which should have been offered to her. That much he knew at that stage of his training.

*Id.* at 190–92.

19. Dr. David L. Williams was an OB/GYN resident at the Naval Hospital in Portsmouth, Virginia, between 1973 and 1977; in August of 1977, he joined the OB/GYN staff at the NRMC and later performed Mrs. Phillips' tubal ligation. Transcript at 212–13. *See* Finding of Fact 9. Although Dr. Williams ingenuously avoided most questions concerning the appropriate standard of care, *see id.* at 218–30, he stated the two most important risk factors with respect to Down's syndrome were advanced maternal age and prior afflicted children. *Id.* at 226. Dr. Williams did concede that, assuming a positive family history for Down's syndrome, "probably the Resident should pursue that further. . . ." *Id.* at 227.

20. Dr. Robert K. Sadler, a second year OB/GYN resident at MUSC in 1977, was on a three month rotation to the NRMC between April and June of 1977. *Id.* at 231–32. Dr. Sadler was the physician who examined Mrs. Phillips on April 17, 1977. *Id.* at 232–34. *See* Finding of Fact 5. Dr. Sadler testified that Mrs. Phillips did not exhibit either of the two primary risk factors, advanced maternal age or prior afflicted children, and, therefore, he did not feel that further counseling or testing was warranted. *Id.* at 235–36. He opined that a family history of Down's syndrome would be a criteria for further counseling and testing today, but was not a criteria in 1977. *Id.* at 237–38. Dr. Sadler conceded that the

facilities for performing amniocentesis were available in Charleston in 1977 and that he knew Down's syndrome could be an inheritable disorder. *Id.* at 239, 242. Finally, Dr. Sadler admitted that, based on his present knowledge, his failure to provide Mrs. Phillips with further genetic counseling and testing was an error in judgment. *Id.* at 240, 242–43.

21. Dr. Robert E. Stevenson, Director of the Greenwood, South Carolina Genetics Center, was duly qualified as an expert in pediatrics and clinical genetics. *Id.* at 265–75; *see* Def. Ex. 2. Dr. Stevenson testified that the primary risk factors with respect to Down's syndrome are advanced maternal age and prior afflicted children. *Id.* at 276–77. Based on the positive family history, he did not feel that failure to provide additional genetic counseling and testing breached the standard of medical care applicable to physicians, *id.* at 275, but admitted that "as a geneticist ... you should make further inquiry." *Id.* at 301.

22. Both Dr. Ronald J. Jorgenson and John Felix Rogers were involved with the cytogenetics lab at MUSC in 1977. *Id.* at 138–40, 245–47; *see* Pl. Ex. 22. Although Dr. Jorgenson is a highly qualified clinical geneticist, Transcript at 132–35; *see* Pl. Ex. 22, he does not hold a medical degree; therefore, Dr. Jorgenson was not able to testify concerning the standard of medical care applicable to OB/GYN specialists and residents in 1977. Transcript at 135–37, 151–55. However, both Dr. Jorgenson and Mr. Rogers testified concerning the laboratory facilities available at MUSC in 1977. The cytogenetics lab was established at MUSC in 1963, *id.* at 139, and supervised by Dr. Jorgenson from 1973 to 1980, *id.* at 132–38; Mr. Rogers was a cytogenic technician at the lab from 1974 to the present. *Id.* at 245. The testimony of these witnesses clearly established that MUSC had the laboratory facilities necessary for the clinic analyses incident to amniocentesis and blood karyotyping, that these tests were in fact being performed in 1977, and that Mrs.

Phillips and Randy, as well as Rhonda May and other members of Mrs. Phillips' family, were tested with the assistance of the lab in late 1977 and 1978. *Id.* at 139, 144–50, 155–58, 245–63; Def. Ex. 1. This court finds that these facilities were available in April and May, 1977, as were similar facilities in Columbia and Greenwood. Transcript at 145–48, 255; *see* Def. Ex. 1.

In 1977 ... [, MUSC] was providing counseling for cases that were referred, cases were being referred to the counseling clinic which is the intake mechanism for the Amniotic Fluid and Biochemical Assay laboratory. We were accepting referrals from around the State and out of the State for patients who had positive family histories of genetic disease or birth defects or who were exposed to various agents that might cause birth defects. The laboratory itself was doing peripheral bloods as you know, chromosome studies on those bloods and was developing the amniotic fluid assay.

Transcript at 145. Strong evidence of the capacity of this lab is provided by an article published in the South Carolina Medical Association Journal,[10] which was introduced as Defendant's Exhibit 1. In addition to his testimony concerning the laboratory facilities, Dr. Jorgenson also testified about the genetic curriculum at MUSC during this period. Transcript at 141–44.

23. After a thorough and circumspect review of the evidence, this court is convinced that the obstetrical care received by Mrs. Phillips at the NRMC did not conform to the applicable standard of medical care. The court views the testimony of Dr. Maxwell as most persuasive on this point. *See* Finding of Fact 18. While the two most important indicia of increased fetal risk of Down's syndrome are advanced maternal age and prior afflicted children, a positive family history of Down's syndrome does constitute "a serious and important risk factor," Transcript at 192; *see* Finding of Fact 18, and the appearance of that risk factor necessitates further genetic counseling.

10. Saul, *et al., Amniocentesis and Prenatal Diagnosis in South Carolina: A Collaborative Re-* *port for the Years 1976 to 1979,* 76 J.S.C. Med. Ass'n 387 (1980).

Under these circumstances, an OB/GYN specialist or resident has a responsibility "to let the patient know that there are things that can be done and should be done in order to determine her risk." Transcript at 190. Mrs. Phillips should have been informed of the significance of her family history, the implications of that history with respect to her decision to bear children, and the availability of testing procedures to determine whether she was a carrier of a 21/14 translocation and whether her fetus was in fact afflicted with Down's syndrome; as succinctly stated by Dr. Maxwell, "she had options which should have been offered to her." Id. at 192. Clearly, the facilities necessary for these diagnostic procedures were available in 1977. See Finding of Fact 22. Every physician who testified indicated that this was the course of conduct he would personally follow, despite attempts to characterize the failure to do so as a mere error in judgment. See Findings of Fact 14–17, 19, 21. Even Dr. Sadler admitted that his failure to offer genetic counseling in the April 17, 1977, appointment was an error in judgment; he also stated that the standard of care at the time of trial would necessitate such counseling, although he attempted, unpersuasively, to draw a distinction between the standard in 1980 and 1977, a distinction wholly unsupported in the record. See Finding of Fact 20. In conclusion, the failure of the staff at the NRMC to provide adequate genetic counseling and prenatal testing in light of Mrs. Phillips' positive family history of Down's syndrome constituted a breach of the applicable standard of obstetrical care, precluding an informed parental decision to avoid the birth of a severely afflicted child and, thereby, proximately causing the birth of William Randall Phillips.

### C. Filial Claim for Neonatal Medical Malpractice

#### (1) Treatment at The NRMC

24. Subsequent to his birth on September 23, 1977, William Randall Phillips was under the care of Dr. Bass. Pl.Ex. 6; Pl.Ex. 7. See Finding of Fact 8. As previously indicated, Dr. Bass was a family practice resident at the NRMC between 1977 and 1979. Transcript at 69. At the time of his birth, Randy "was noted to have a [heart] murmur." Id. at 78. See Pl.Ex. 6. According to Dr. Bass, the child

> was brought back at two weeks of age to see what the status of the murmur was. It was at that time louder, and I referred him to the cardiologist at our hospital, Dr. Spielman, and also had him seen by the pediatricians there at the Naval Hospital.

Transcript at 78. Dr. Speilman ran numerous tests on Randy, including an EKG, chest x-ray, and echocardiogram; these tests, in conjunction with the physical examination, led to a diagnosis of the cardiac disorder as a ventricular septal defect,[11] which is an abnormal opening in the septum that divides the two lower chambers of the heart. Id. at 78–80, 86–90. See Pl.Ex. 6. Dr. Speilman's

> recommendation at that point was to follow the child for a period of time, and if the child had any congestive heart failure during that period, to digitalize him, to give him medicine to strengthen his heart, and around a year of age catherize him, doing a cardiac catheterization test to determine exactly what degree of defect there was.

Transcript at 78.

25. During this period, Randy exhibited numerous symptoms related to his cardiac defect. These included cyanosis, retarded growth, emesis, lack of muscle force, depressed body temperature and pale or clammy skin. Id. at 22–23, 58–60, 80, 93. See Pl.Ex. 6.

26. On December 15, 1977, Randy was readmitted to the NRMC by Dr. Bass with an admission diagnosis of pneumonia and

---

11. The possibility of an endocardial cushion defect was also considered and rejected. Transcript at 89–90. The possibility of a patent ductus arteriosis, a congenital anomaly resulting in the recirculation of arterial blood to the lungs, was apparently never considered. Id. at 80–81. See Pl.Ex. 6; Pl.Ex. 7.

congestive heart failure. Transcript at 80, 93–94; Pl.Ex. 7. Dr. Bass "put him on antibiotics for the pneumonia and gave him Digoxin [digitalis] to strengthen his heart, and he improved but still had problems during that period." Transcript at 80. *See* Pl.Ex. 7.

27. Between January and May, 1978, Randy continued to exhibit symptoms such as cyanosis, sweating, and retarded growth. Transcript at 58–60, 80–81, 95–97. *See* Pl.Ex. 7. At the request of Randy's parents, Dr. Bass attempted to refer the child to a pediatric cardiologist, but the NRMC denied these referral requests. Transcript at 23–24, 27–28, 60–61, 81. Eventually, because of Mr. Phillips' impending discharge from the Navy,[12] Dr. Bass suggested that they consult a local pediatric cardiologist, *id.* at 81–82, 97, and Mrs. Phillips took Randy to an appointment with Dr. Donald A. Riopel at MUSC on June 19, 1978.[13] Pl.Ex. 2. *See* Transcript at 24, 98–99.

### (2) Treatment at MUSC

28. Randy was seen by Dr. Riopel at MUSC on June 19, 1978. Transcript at 112–114; Pl.Ex. 2; Pl. Ex. 8. Based upon the child's history and a physical examination, Dr. Riopel diagnosed the cardiac defect as a patent ductus arteriosis within minutes of first seeing him. Transcript at 113. *See id.* at 24–25 (examination and diagnosis took "[a]bout two minutes"). As stated by Dr. Riopel, "it didn't take too long. The findings were fairly classic." *Id.* at 113.

29. After Dr. Riopel's preliminary diagnosis of the child's patent ductus arteriosis, Randy was admitted to MUSC. *Id.* at 25, 113; Pl.Ex. 2; Pl.Ex. 8. A cardiac catheterization was performed on June 21, 1978, "which documented the clinical impression of a large patent ductus arteriosis with pulmonary hypertension." Pl.Ex. 8. *See* Transcript at 114; Pl.Ex. 2. On June 23, 1978, Randy underwent a surgical ligation

of the heart defect by Dr. Ashby Taylor; on June 28, 1978, the child was discharged from the hospital. Pl.Ex. 8. "[F]ollowing the ligation, the child had a much better respiratory condition, was able to breathe better, required no medication, heart size came down ..., and ... there was some improvement in his growth thereafter." Transcript at 114. *See id.* at 60.

### (3) Standard of Care

30. The crucial issue in the filial claim is whether the failure of the staff at the NRMC to correctly diagnose the child's cardiac disorder or to refer him to a pediatric cardiologist for examination constituted a breach of the applicable standard of care. It is uncontested that cardiac defects are frequently associated with Down's syndrome and that ventricular septal defects are more common than patent ductus arteriosis defects. Transcript at 88–89, 288.

31. The evidence presented by plaintiff on the standard of care consisted of the testimony of Dr. Donald A. Riopel and Dr. Robert R. Bass. Defendant presented the testimony of Dr. Roger E. Stevenson.

32. Dr. Riopel, Randy's treating physician at MUSC, *see* Finding of Fact 28, was duly qualified as an expert in pediatric cardiology. Transcript at 110–111. Dr. Riopel stated: "The findings were fairly classic .... [T]he child did have the findings of a patent ductus arteriosis on clinical findings." *Id.* at 113.

Q. Okay. Do you have an opinion satisfactory to yourself based upon reasonable medical certainty as to whether or not in the treatment and care which Randy received at the Naval Hospital that there was any departure from the care that was owed to him with regard to referral to you or treatment or anything else concerning the heart?

A. Well, although these conditions are treatable with medication which was giv-

---

12. Mr. Phillips was discharged from the Navy on July 1, 1978. Transcript at 24, 51.

13. The parents apparently paid for the first visit to Dr. Riopel, which was arranged by Dr.

Bass, Transcript at 24, but the Navy later paid eighty percent of Randy's treatment at MUSC under a military insurance program. *Id.* at 28, 85.

en this child, I would say that most physicians, pediatricians or family practitioners in this State would refer us a child early on, a child with congestive heart failure, would refer him very early on in this course.

Q. Well, how do you know that the child had congestive heart failure before you saw him?

A. By history—by history from the parents and the physician.

A. Okay, sir. Does the fact that the child is receiving Digitalis have any significance, that is, Digitalis within a month-and-a-half or two of his birth.

A. Right. Digitalis is used to treat only two problems in heart disease: one is an arrhythmia, which is a rhythm problem; and the other is congestive heart failure, and the history was that the child had had congestive heart failure and was receiving Digitalis for it.

Q. You are saying to summarize, in effect, there should have been a referral to you at an earlier time?

A. That was my opinion.

Q. All right, sir. With regard to any of the other treatment he received, do you have any quarrel with that?

A. No.

*Id.* at 114–115. "[T]he referral should take place when the child first presents congestive heart failure, whether it be three weeks, four weeks, one month, [or] two months." *Id.* at 126. In situations involving large cardiac defects, immediacy of treatment is imperative because of the potential damage from pulmonary hypertension. *Id.* at 125. Finally, Dr. Riopel testified that cardiac catheterization is necessary to distinguish between various congenital cardiac defects. *Id.* at 119–20.

33. Dr. Bass admitted that the possibility of a patent ductus arteriosis was not considered in the initial differential diagnosis of Randy's cardiac defect. *Id.* at 80–81. *See* Pl.Ex. 6. He also admitted that he would have referred the child to a pediatric cardiologist earlier if he had known that he had a patent ductus arteriosis. *Id.* at 82–83. Dr. Bass' eventual referral of Randy to

Dr. Riopel was prompted by the child's retarded growth and by his father's imminent discharge from the Navy. *Id.* at 81.

34. Dr. Stevenson was duly qualified as an expert in pediatrics. *Id.* at 265–70; *see* Def.Ex. 2. Dr. Stevenson testified that the applicable standard of medical care would require "conservative management of . . . [the heart defect], so that the baby can gain and grow to above twenty pounds or so hopefully so that the baby may have proper diagnostic studies and cardiac surgery, if that's indicated." Transcript at 289. This approach, however, would not apply if "something threatens the baby prior to a year [of age]." *Id.* at 291–92. Dr. Stevenson conceded that evidence of pulmonary hypertension would lead him to "anticipate referral within a reasonable time," *id.* at 310, but maintained that the care here did not deviate from the standard of care. *Id.* at 289, 309.

35. After a thorough and circumspect review of the evidence, this court is convinced that the pediatric care received by William Randall Phillips at the NRMC did not conform to the applicable standard of medical care. The court views the testimony of Dr. Riopel as most persuasive on this point. *See* Finding of Fact 32. Cardiac defects are unquestionably associated with Down's syndrome and the risk of pulmonary hypertension incident to congestive heart failure presents a very grave threat. *See* Findings of Fact 31–32. Under these circumstances, a pediatric or family practice specialist or resident should refer an infant patient to a pediatric cardiologist at the first sign of congestive heart failure. *See* Finding of Fact 32. Although Randy showed clear signs of congestive heart failure in December, 1977, *see* Finding of Fact 26; Pl.Ex. 7, he was not referred to Dr. Riopel until June 19, 1978. *See* Findings of Fact 27–28. This clearly constituted a breach of the applicable standard of medical care, which proximately caused certain damages to be suffered by Randy, although the precise nature and scope of these damages are beyond the ambit of this order. This court finds that, as stated by Dr. Rio-

pel, the staff at the NRMC "deviated [from the standard of care] in not referring the child earlier than they did." Transcript at 129.

### CONCLUSIONS OF LAW

As previously indicated, this action was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80, and jurisdiction is predicated on 28 U.S.C. § 1346. Under the Federal Tort Claims Act, the district court is bound to follow "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b); *e.g., id.* § 2674, *Long v. United States,* 241 F.Supp. 286 (W.D.S.C. 1966), and, in the absence of controlling precedents, the court must attempt to predict the determination that the state supreme court would reach if confronted with the question. *Quinones v. United States,* 492 F.2d 1269 (3d Cir.1974); *Todd v. Sandidge Construction Co.,* 341 F.2d 75 (4th Cir.1964). Therefore, it is incumbent upon this court to examine the substantive law of South Carolina with respect to medical malpractice.

■ The basic parameters of the parental claim for wrongful birth were established by this court in a previous order. *Phillips v. United States,* 508 F.Supp. 544 (D.S.C.1981). In that order, the court, based on "both the trend of authorities and the applicable policy considerations," *id.* at 551, held that a claim predicated upon the alleged failure to provide adequate genetic counseling and prenatal testing did state a viable cause of action sounding in negligence or medical malpractice. *Id. See, e.g., Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (applying Alabama law); *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F.Supp. 692 (E.D.Pa. 1978); *Turpin v. Sortini,* 119 Cal.App.3d 690, 174 Cal.Rptr. 128 (Ct.App.1981); *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (N.J.Sup.Ct.1981); *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372 (1975). Stated simply, "[s]ociety has an interest in insuring that genetic testing is properly performed and interpreted." *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F.Supp. 692, 696 (E.D.Pa.1978).

The increasing importance of these procedures in modern life and their entry into the mainstream of accepted medical practices, *see* Saul, *et al., Amniocentesis and Prenatal Diagnosis in South Carolina: A Collaborative Report for the Years 1976 to 1979,* 76 J.S.C. Med. Ass'n 387, 387–88, 389 (1980), as well as the extreme sensitivity of the issues and interests involved, dictate that plaintiffs' rights be afforded some protection. The most appropriate mechanism for this protection is the ancient, yet vital and constantly evolving doctrine of negligence.

*Phillips v. United States,* 508 F.Supp. 544, 551 (D.S.C.1981). Thus, the parental claim for wrongful birth, as well as the filial claim for neonatal medical malpractice, both state causes of action sounding in negligence or medical malpractice.

Generally speaking,

[t]he burden of proof of negligence, proximate cause, and injury in a medical malpractice case is on the plaintiff throughout. In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following:

(a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances.

(b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures.

(c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury.

(d) The plaintiff was injured. *Steeves v. United States,* 294 F.Supp. 446 (D.S.C. 1968); *Price v. Neyland,* 115 U.S.App. D.C. 355, 320 F.2d 674 (D.C.Cir.1963).

*Ellis v. United States,* 484 F.Supp. 4, 10–11 (D.S.C.1978). *E.g., Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910 (1978); *Burke v. Pearson,* 259 S.C. 288, 191 S.E.2d 721 (1972); *Bessinger v. DeLoach,* 230 S.C. 1, 94 S.E.2d 3 (1956). Of course, "[s]ince many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary." *Green v. Lilliewood,* 272 S.C. 186, 191, 249 S.E.2d 910, 912 (1978). As suggested in *Ellis v. United States,* South Carolina courts, until recently, applied a "locality rule" in determining the standard of care in medical malpractice cases, holding that a physician "is only bound to possess and exercise that degree of skill and learning which is ordinarily possessed and exercised by members of his profession in good standing in the same general neighborhood or in similar localities." 272 S.C. at 7, 94 S.E.2d at 6. *E.g., Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968); *Kapuschinsky v. United States,* 248 F.Supp. 732 (D.S.C.1966); *Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910 (1978). However, in *King v. Williams,* 276 S.C. 478, 279 S.E.2d 618 (S.C.1981), the South Carolina Supreme Court "discard[ed] this rule and adopt[ed] a standard of care not bound by any geographical restrictions." *Id.* 279 S.E.2d at 620. Recognizing the standardization of medical education, the wide dissemination of medical research and information, and the increased access to modern medical facilities, *see,* W. Prosser, Law of Torts § 32 (4th ed. 1971), as well as the contemporary criticism of the rule, *e.g., id.;* 22 S.C.L.Rev. 810 (1970), and the trend of authority toward loosening its geographical strictures, *e.g., McNeill v. United States,* 519 F.Supp. 283 (D.S.C.1981); *see generally* Annot., 37 A.L.R.3d 420 (1971), the court enunciated the following standard:

> The "locality rule" has no present-day vitality except that it may be considered as *one* of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent

practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area.

*King v. Williams,* 276 S.C. 478, 279 S.E.2d 618, 620, *quoting Pederson v. Dumouchel,* 72 Wash.2d 73, 431 P.2d 973 (1967). "Other factors meriting consideration include the type of injury involved, as in *Rucker v. High Point Memorial Hospital, Inc.,* 285 N.C. 519, 206 S.E.2d 196 (1974), and the medical facilities available, as in *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793 (1968)." *King v. Williams,* 276 S.C. 478, 279 S.E.2d 618, 620.

Taking into consideration the factors suggested in *King v. Williams,* this court is convinced that plaintiffs have discharged their burden of proof in showing that the failure of the staff at the NRMC to provide adequate genetic counseling and prenatal testing in light of Mrs. Phillips' positive family history of Down's syndrome and their failure to refer the child to a pediatric cardiologist at the first sign of congestive heart failure constituted deviations from the applicable standard of medical care and proximately caused some elements of damages to the respective plaintiffs. With respect to the parental claim, the testimony clearly demonstrates that Dr. Sadler's failure to provide adequate genetic counseling and prenatal testing to Mrs. Phillips constituted a breach of the standard of care. *See* Finding of Fact 23. Even assuming *arguendo* that *King v. Williams* was not applicable to this case, Dr. Sadler's status as a second year OB/GYN resident would render defendant subject to a national standard of care by virtue of his supervision by the specialists on the OB/GYN staff, *McCullough v. Hutzel Hosp.,* 88 Mich.App. 235, 276 N.W.2d 569 (1979), as well as his own expertise and schooling, *Valentine v. Kaiser Foundation*

*Hosp.,* 194 Cal.App.2d 282, 15 Cal.Rptr. 26 (1961). *See, e.g., Robbins v. Footer,* 553 F.2d 123 (D.C.Cir.1977); *Belk v. Schweizer,* 268 N.C. 50, 149 S.E.2d 565 (1966). *See generally* Annot., 21 A.L.R.3d 953 (1968). The testimony of physicians practicing outside that specialty is admissible on the issue of the standard of care, but such testimony may not be entitled to the weight accorded expert testimony within that specialty. *Hill v. South Carolina Power & Light Co.,* 204 S.C. 83, 28 S.E.2d 545 (1943). *See generally* Annot., 31 A.L.R.3d 1163 (1970). Thus, regardless of the applicability of *King v. Williams,* the testimony, particularly that of Dr. Maxwell, convincingly established that defendant's failure to provide adequate genetic counseling and prenatal testing in light of Mrs. Phillips' positive family history of Down's syndrome constituted a deviation from the applicable standard of obstetrical care. *See* Finding of Fact 23. Defendant is, therefore, liable for whatever damages flow from that breach of care.

■ The preceding reasoning is also pertinent to the filial claim for neonatal medical malpractice because of Dr. Bass' status as a family practice resident. Moreover, "a higher degree of care is required of a hospital in caring for a child than an adult." *Kapuschinsky v. United States,* 248 F.Supp. 732, 736 (D.S.C.1966). *E.g., St. Luke's Hosp. Ass'n. v. Long,* 125 Colo. 25, 240 P.2d 917 (1952). The failure to refer a patient to the appropriate specialist when reasonably medically indicated unquestionably constitutes a breach of the standard of care. *McNeill v. United States,* 519 F.Supp. 283 (D.S.C.1981); *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968). This court has found that such a referral was appropriate in December, 1977, when plaintiff first exhibited signs of congestive heart failure. *See* Finding of Fact 35. Although, under some circumstances, there may be no liability for medical misdiagnosis, *e.g., Hicks v. United States,* 368 F.2d 626 (4th Cir.1966); *Ellis v. United States,* 484 F.Supp. 4 (D.S.C. 1978); *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968), this is true "[o]nly if the patient is adequately examined . . . ." *Hicks v. United States,* 368 F.2d 626, 630

(4th Cir.1966). In the present case, defendant's misdiagnosis of plaintiff's cardiac defect is actionable because he was not adequately examined at the time of his congestive heart failure through the appropriate procedure of cardiac catheterization. *See* Findings of Fact 32, 35. Thus, the testimony, particularly that of Dr. Riopel, clearly demonstrated that defendant's failure to refer plaintiff to a pediatric cardiologist or to adequately examine him at the first sign of congestive heart failure constituted a breach of the applicable standard of family practice or pediatric care. *See* Finding of Fact 35. Defendant is, therefore, liable for whatever damages flow from that breach of care.

For the foregoing reasons, this court holds that plaintiffs have demonstrated by a preponderance of the evidence the necessary elements to establish liability on the part of defendant through its agents and employees. Although the purpose of the present order is only to resolve the issue of liability, this holding necessitates the eventual confrontation of the issue of damages. While nothing in this order is intended to permit or preclude a particular element of damages, the court has previously recognized that "the question of damages has presented a difficult and troublesome problem to the courts that have considered 'wrongful birth' claims, with that difficulty engendering widely divergent approaches . . . ." *Phillips v. United States,* 508 F.Supp. 544, 551 (D.S.C.1981). The scope of damages adopted by other courts has included compensation for pecuniary loss, *see, e.g., Robak v. United States,* 658 F.2d 471 (7th Cir.1981); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tex.1975), and emotional distress, *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); however, the precise measure of damages permissible in this jurisdiction must await a more appropriate time for resolution.

AND IT IS SO ORDERED.