Dwight A. PHILLIPS and Kathleen E. Phillips, Plaintiffs,

v.

UNITED STATES of America, Defendant.

William Randall PHILLIPS, by his Guardian ad Litem, Dwight A. PHILLIPS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 79–551–8, 79–553–8.

United States District Court, D. South Carolina, Charleston Division.

June 21, 1983.

Ellis I. Kahn, Charleston, S.C., for plaintiffs.

Jack L. Marshall, Asst. U.S. Atty., Columbia, S.C., for defendant.

## ORDER

BLATT, District Judge.

### I. INTRODUCTION

This matter is before the court for final disposition of the issue of damages in plaintiffs' consolidated medical malpractice actions against the United States, which were brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80.

This court has previously addressed certain aspects of these claims in considerable detail.[1] In *Phillips v. United States*, 508 F.Supp. 537 (D.S.C.1980) (hereinafter *Phillips I*), the court granted defendant's motion for summary judgment of the filial claim for "wrongful life."[2] Shortly thereafter, in *Phillips v. United States*, 508 F.Supp. 544 (D.S.C.1981) (hereinafter *Phillips II*), the court denied defendant's motion for summary judgment of the parental claim for "wrongful birth." In *Phillips v. United States*, 566 F.Supp. 1 (D.S.C. 1981) (hereinafter *Phillips III*), the court found that the medical care provided by defendant did not conform to the applicable standard of care, *id.* at 25–27, finding for plaintiffs on the issue of liability and the wrongful birth claim.

Briefly, plaintiffs have shown that the staff of the Naval Regional Medical Center (NRMC) in Charleston, South Carolina, breached the applicable standards of medical care by failing to advise, counsel, and test the parents concerning the risk that their offspring would be afflicted with Down's syndrome, commonly known as mongolism, and by failing to diagnose and treat a cardiac disorder in the newborn child. This court has specifically found that

the failure of the staff of the NRMC to provide adequate genetic counseling and prenatal testing in light of Mrs. Phillips' positive family history of Down's syndrome and their failure to refer the child to a pediatric cardiologist at the first sign of congestive heart failure constituted deviations from the applicable standard of medical care and proximately caused some elements of damages to the respective plaintiffs.

*Phillips III* at 25. On February 22 and 23, 1982, testimony on the issue of damages

---

1. For the sake of brevity, as well as clarity, and to avoid extensive citations to these previous opinions, the general discussions concerning medical background and terminology contained therein are incorporated by reference in this order. *See Phillips v. United States*, 508 F.Supp. 544, 545–46 (D.S.C.1981); *Phillips v. United States*, 508 F.Supp. 537, 538–39 (D.S.C.1980).

2. Although the court rejected the infant plaintiff's wrongful life claim, his claim for neonatal medical malpractice survived defendant's summary judgment motion. *Phillips I*, 508 F.Supp. at 544.

was heard by this court. After thorough review of that testimony, as well as the numerous exhibits introduced by the parties, this court hereby renders its findings of fact and conclusions of law pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure.

## II. FINDINGS OF FACT

### A. Filial Claim for Neonatal Medical Malpractice

1. This court has previously found that "the pediatric care received by William Randall Phillips at the NRMC did not conform to the applicable standard of medical care." *Phillips III* at 21.

> [A] pediatric or family practice specialist or resident should refer an infant patient to a pediatric cardiologist at the first sign of congestive heart failure. *See* Finding of Fact 32. Although Randy showed clear signs of congestive heart failure in December, 1977, *see* Finding of Fact 26; Pl.Ex. 7, he was not referred to Dr. Riopel until June 19, 1978. *See* Finding of Fact 27–28. This clearly constituted a breach of medical care ....

*Id.* at 21–22.

2. "During this period, Randy exhibited numerous signs and symptoms related to his heart condition. These included cyanosis, retarded growth, emesis, lack of muscle force, depressed body temperature and pale or clammy skin." *Id.* at 17. According to the testimony of his mother,

> He did a lot of crying. He was real limp. He used to turn blue around the lips and just be splotchy blue. I'd have to sit up at night in a rocking chair holding him up to get him to sleep. I couldn't lay him down because when I laid him down he would start crying again. And like feeding him, his sucking the bottle, he would start turning blue; so I would have to take the bottle away from him every couple of sips. He would get mad and start crying. He would usually throw up three or four times a day at least because he would get so mad crying because I took the bottle away from him that he gagged himself and started

throwing up. He was just a miserable little baby is what he was.

Transcript at 124–25.

3. On June 23, 1978, shortly after Dr. Riopel's diagnosis of plaintiff's cardiac problem, "Randy underwent a surgical ligation of the heart defect by Dr. Ashby Taylor ..." *Phillips III* at 19.

4. Following this procedure, plaintiff's condition improved markedly. Transcript at 126–27. According to the testimony of plaintiff's pediatric witness, Dr. Robert F. Marion, Jr., defendant's failure to promptly diagnose plaintiff's cardiac condition will have no lasting physical effect; "there should be no sequelae related to this." Transcript at 8. This conclusion is also buttressed by the previous testimony of Dr. Riopel. *See Phillips III* at 19.

■ 5. After a careful and circumspect review of the evidence, this court finds that plaintiff William Randall Phillips is entitled to damages for his pain and suffering and loss of enjoyment of life during the six-month period between the first indication of congestive heart failure in December, 1977, and his eventual referral to Dr. Riopel in June, 1978.

### B. Parental Claim for Wrongful Birth

6. Plaintiffs presented expert testimony from Dr. Robert F. Marion, Jr., a pediatrician, *see* Transcript at 5–82, Lucia T. Horowitz, Ph.D., a psychologist, *see id.* at 83–122; Pl.Ex. 1, and Oliver G. Wood, Jr., Ph.D., an economist, *see id.* at 156–89, on the issue of damages in the wrongful birth claim; additionally, both of the plaintiffs testified in their own behalf. *See id.* at 123–55, 189–205. Defendant presented expert testimony from Victor J. Malatesta, Jr., Ph.D., a psychologist, *see* Transcript (Vol. II) at 6–36; Def.Ex. 2, and James M. Kirby, an official with the South Carolina Department of Mental Retardation, *see* Transcript at 37–79.

7. Dr. Marion testified that, based on his examination of plaintiffs' child, as well as his review of the clinical history and pertinent medical literature, Randy had a

life expectancy of approximately 50 years. Transcript at 19, 48, 53. Defendant's attempt to discount this figure through the testimony of Dr. Malatesta was somewhat persuasive. *See* Transcript (Vol. II) at 6–19, 31–34.

8. The expert medical testimony of Dr. Marion, which was uncontradicted, establishes that "Randy is going to need twenty-four hour care and supervision." Transcript at 21. *See also id.* at 40–44. Moreover, Randy will require physical therapy, *id.* at 22, hearing and speech therapy, *id.* at 23–25, and extensive medical services, including ongoing pediatric, ENT, orthopedic, neurological, ophthamological, and dental care, *id.* at 26–36, as well as frequent medication and periodic hospitalization.[3] *Id.* at 29, 34–36.

9. Dr. Marion referred plaintiffs' child to Dr. Horowitz for psychological testing and evaluation. The various tests she administered, including the Stanford-Binet Intelligence Scale, indicated that Randy had an I.Q. of fifty-six, which is in the bottom of the mildly retarded range, *id.* at 86–87, that "his language skills were somewhat depressed," *id.* at 87, *see id.* at 87–89, particularly his receptive language skills, *id.* at 88–89, 91–95, and that he had the "most difficulty in areas of responsibility and ideation". *Id.* at 93. Dr. Horowitz states that Randy's test results indicated a current mental age of approximately two to three years[4], *id.* at 86–88, and that his mental age was never expected to exceed seven years. *Id.* at 101.

10. Dr. Horowitz also testified that Randy needs special schooling, commencing immediately, *id.* at 96–98, but that he could eventually be placed in a special public school class. *Id.* at 98. She reiterated that he would not be able to care for himself and, at best, could be expected to enter a group home with vocational training or a

sheltered workshop sometime between the ages of eighteen and twenty-one. *Id.* at 100–08.

11. As previously indicated, defendant attempted to discredit the testimony of Dr. Marion and Dr. Horowitz through the testimony of Dr. Malatesta. Although Dr. Malatesta heard the testimony of plaintiffs' experts and reviewed certain medical literature, Transcript (Vol. II) at 8, 11–12, he did not examine Randy. *Id.* at 25–26. Without reaching the question of whether Dr. Malatesta is competent to proffer a medical opinion, *see id.* at 34, this court concurs in his concession that Dr. Horowitz's personal examination and testing of Randy put her in a much better position to make a psychological evaluation.[5] *Id.* at 25–26.

12. Predicated on the testimony of Dr. Marion and Dr. Horowitz, plaintiffs presented the testimony of Oliver G. Wood, Jr., Ph.D., concerning "the cost of certain maintenance items, medical items and certain care costs over the rest of the life of the boy." Transcript at 157. The government admitted that Dr. Wood is a well qualified economist. *Id.* at 156.

13. After thoroughly reviewing the historical rise in medical and maintenance costs, *id.* at 160–163; Pl.Ex. 4–7, Dr. Wood testified extensively concerning the costs attributable to Randy's condition.

> Because of the child's condition, the child will need the following care: A, twenty-four hours per day care for life. B, therapy in the form of, one, physical therapy, thirty-five dollars per visit, current cost, two times per week for one month, one time per week for the following month, one time per month for the next three years. With respect to speech therapy, current cost is thirty-six dollars an hour. It's needed for one-half hour, five days a week to age seven. Two times per week to age nine. One time

---

**3.** Dr. Marion's testimony also included estimates of the cost of all of these medical services. Transcript at 26–36.

**4.** As an example of Randy's developmental problems, Dr. Horowitz testified that he was not yet toilet trained. Transcript at 108.

**5.** Dr. Malatesta also conceded that Dr. Horowitz "did a very good range of tests. She investigated the case thorough[ly] ...." Transcript (Vol. II) at 193.

per week to age twelve. With respect to schooling, parental training is needed at seven hundred fifty dollars .... on a one time basis. Nursery training, seventy dollars per month now, a hundred twenty dollars per month beginning in September of '82 for ten months a year to age seven. With respect to physicians first, regular physicians' current cost of eighteen dollars per visit, eight times per year to life expectancy. Lab fees thirty dollars one time per year to life expectancy. ENT specialists, thirty dollars per visit every two years to life expectancy. Ophthalmologist, thirty-five dollars per visit every eight months to life expectancy. Dentist, two hundred dollars per year every year, approximately two to three visits to life expectancy. Orthopedist, sixty dollars per visit every two years to life expectancy. Neurologist, eighty-five dollars per visit every four years to life expectancy. Medications, a hundred fifty dollars per year every year to life expectancy. Hospitalization four times during his lifetime, current cost two hundred dollars per day, five days per stay. Diagnostic tests, one hundred fifty dollars per stay. Physicians' costs, twenty dollars per day during these stays. The mother spends at present approximately a hundred dollars per month on food for the child, three hundred dollars per year on clothing for the child; two hundred dollars per month for rent on a trailer and a lot; eighty-five dollars per month for utilities. The mother lives thirty-seven miles from Charleston and provides transportation for the child. The current cost of institutional care at the residential group home is fifty-three dollars, forty-six cents per day and at the Coastal Center fifty-eight dollars and thirty-two cents per day. Transcript at 164–66; Pl.Ex. 8. After taking into account inflation and discounting the future expenses to present cash value, Dr. Wood testified concerning the costs of providing the aforementioned services until Randy is approximately eighteen years old,

Transcript at 167–72; Pl.Ex. 9, the costs of providing those services from age eighteen to age thirty, forty, or fifty,[6] Transcript at 172–75; Pl.Ex. 10–13, and the economic costs from Randy's birth until the date of trial, Transcript at 175–77; Pl.Ex. 14.

14. Defendant did not present any expert economic testimony concerning the medical and custodial services necessitated by Randy's condition. Upon cross-examination, Dr. Wood testified that the cost of raising a normal child to age eighteen in this area was between fifty and seventy-five thousand dollars. Transcript at 178–80. Defendant did present the testimony of James M. Kirby, an official with the South Carolina Department of Mental Retardation, Transcript (Vol. II) at 37–79, concerning the available facilities and services provided by the State.

15. After a careful and circumspect review of the evidence, this court finds that plaintiffs, Dwight A. Phillips and Kathleen E. Phillips, are entitled to damages for the extra-ordinary expenses, medical, custodial, and otherwise, necessitated by their child's condition from birth to an estimated life expectancy of forty years. They are also entitled to damages for emotional distress, as discussed more fully hereinafter.

## III. CONCLUSIONS OF LAW

### A. *Generally*

As previously indicated, this action was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80, and jurisdiction is predicated on 28 U.S.C. § 1346. Under the Federal Tort Claims Act, the district court is bound to follow "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b); *e.g.*, *id.* § 2674, *Long v. United States*, 241 F.Supp. 286 (W.D.S.C.1965), and, in the absence of controlling precedents, the court must attempt to predict the determination that the state supreme court would reach if con-

---

6. These calculations incorporated three different proposals: private sitter, Coastal Center

(Ladson), and residential group home. Transcript at 173. *See* Pl.Ex. 10–13.

fronted with the question. *Quinones v. United States*, 492 F.2d 1269 (3d Cir.1974); *Todd v. Sandidge Construction Co.*, 341 F.2d 75 (4th Cir.1964). Therefore, it is incumbent upon this court to examine the substantive law of South Carolina with respect to damages.

■ South Carolina courts have consistently held that a plaintiff in a personal injury case is entitled to recover all damages proximately resulting from defendant's negligent acts. *E.g., Wright v. Charles Pfizer & Co.*, 253 F.Supp. 811 (D.S.C.1966); *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286 (1964). The general principle enunciated in these cases has also been applied to medical malpractice actions. *Steeves v. United States*, 294 F.Supp. 446 (D.S.C.1968). *See also Brown v. Niles*, Nos. 82–0041–14 and 82–0042–14 (D.S.C. Sept. 24, 1982), *aff'd*, 707 F.2d 505 (4th Cir.1983). This traditional rule of damages provides the touchstone for the court's analysis of the damages incurred by these plaintiffs.

### B. Filial Claim for Neonatal Medical Malpractice

Although the medical testimony in this case has established that plaintiff, William Randall Phillips, did not incur any permanent injury by virtue of defendant's failure to refer him to a pediatric cardiologist at the first sign of congestive heart failure, *see* Finding of Fact 4, plaintiff is clearly entitled to damages for his pain, suffering, and loss of enjoyment of life during the six-month period between the first indication of congestive heart failure and his eventual referral to Dr. Riopel. *See* Finding of Fact 5. *McNeill v. United States*, 519 F.Supp. 283, 289–290 (D.S.C.1981). Plaintiff's infancy and inability to articulate the pain and anguish he has suffered, *see* Finding of Fact 2, do not diminish this

court's duty to fully compensate him for his injuries; of course, money damages provide the only allowable medium for such compensation. *See Vaughan v. Southern Bakeries*, 247 F.Supp. 782 (E.D.S.C.1965). Taking these factors into account, this court finds that an appropriate amount for the child's damages is Five Thousand and no/100 ($5,000.00) Dollars.

### C. Parental Claim for Wrongful Birth

#### 1. Generally

■ As previously noted by this court, "the question of damages has presented a difficult and troublesome problem to the courts that have considered 'wrongful birth' claims, with that difficulty engendering widely divergent approaches...." *Phillips II*, 508 F.Supp. at 551. Courts generally allow the extraordinary expenses relating to the child's condition that must be borne by the parents, *e.g., Harbeson v. Parke-Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975), and some courts have also compensated the parents for their pain and suffering or mental anguish.[7] *E.g., Harbeson, supra; Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981). One court has allowed all expenses incident to the care of the child, without discounting those expenses not directly related to the child's condition that would be necessary for a normal child. *Robak v. United States*, 658 F.2d 471 (7th Cir.1981).

#### 2. Economic Damages

■ The jurisdictions that have considered wrongful birth claims are currently unanimous in their allowance of damages for the parent's economic or pecuniary loss

---

7. Prior to *Schroeder,* the New Jersey courts permitted only emotional damages in wrongful birth cases, precluding damages for pecuniary loss as a matter of law. *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979). Conversely, other courts have expressly disallowed emotional damages, *e.g., Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), while others have not addressed the issue. *See*

due to the child's condition.[8] After a thorough review of those cases in light of the general law of South Carolina concerning damages, this court holds that plaintiffs are entitled to damages for all of the extraordinary expenses necessitated by their child's condition.

This court disagrees with plaintiff's contention that defendant should be liable for all of the expenses incident to raising their child, whether or not those expenses are directly attributable to the child's condition. While some courts have allowed child-rearing expenses in "wrongful pregnancy" cases, involving children born after negligently performed contraceptive procedures, e.g., *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977); *Speck v. Finegold*, 268 Pa.Super.Ct. 342, 408 A.2d 496 (1979), those cases are distinguishable from the present one because " 'wrongful pregnancy' actions typically involve a[n] ... *unwanted* child; '[w]rongful birth' actions, on the other hand, usually involve *planned* children who, coincidentally, were born with congenital defects." *Phillips II*, 508 F.Supp. at 545 n. 1, *quoting* 54 Tulane L.Rev. 480, 485 (1980) (emphasis in original). To the extent that this conclusion is inconsistent with the opinion of the United States Court of Appeals for the Seventh Circuit in *Robak*, this court expressly declines to follow that opinion.

■ Through the testimony of Mr. Kirby, *see* Finding of Fact 14, defendant presented evidence concerning the facilities and services available to plaintiffs at no cost through the South Carolina Department of Mental Retardation and other federal and state agencies. Even assuming the continued availability of these facilities

and services, as well as the equivalence of these facilities and services to the facilities and services of private residential group homes, defendant's argument completely disregards the collateral source rule. *E.g., New Foundation Baptist Church v. Davis*, 257 S.C. 443, 186 S.E.2d 247 (1972); *Powers v. Temple*, 250 S.C. 149, 156 S.E.2d 759 (1967). Moreover, to the extent that Mr. Kirby's testimony concerned services provided through federal funds, *see* Transcript (Vol. II) at 48, 59, these funds also do not constitute a proper offset. *E.g., United States v. Hayashi*, 282 F.2d 599 (9th Cir.1960); *Cooper v. United States*, 313 F.Supp. 1207 (D.Neb.1970). *See generally,* 2 L. Jayson, *Handling Federal Tort Claims* § 228.05 at 10–41 (1980); Annot. 12 A.L.R.3d 1245 (1967). Finally, to the extent that Randy may ultimately receive benefits from the South Carolina Department of Mental Retardation, that agency is empowered to seek reasonable compensation from beneficiaries who have sufficient financial means. *See* S.C.Code Ann. § 44–21–260 (1976); *see also* Transcript (Vol. 22) at 67.

Dr. Wood provided the court with several alternative options with respect to the calculations concerning the parents' economic damages.[9] His calculation of the reasonable value of attendant care, food, clothing, housing and other necessary items from birth to age 4.42 years, which coincides with the date of trial, February 22, 1982, was essentially uncontradicted by the defendant. This amount is One Hundred Twenty-Four Thousand, Six Hundred Sixty-Nine and no/100 ($124,669.00) Dollars. Transcript at 175–77; Pl.Ex. 17. *See* Finding of Fact 13.

---

*Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975).

**8.** These jurisdictions are: Alabama, *Robak v. United States*, 658 F.2d 471 (7th Cir.1981); California, *Turpin v. Sortini*, 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982); New Jersey, *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981); New York, *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); Pennsylvania, *Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F.Supp. 692 (E.D.Pa.1978);

Texas, *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex. 1975); Virginia, *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825 (1982); Washington, *Harbeson v. Parke-Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983); and Wisconsin, *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975).

**9.** The defendant produced no economic testimony or projections to refute Dr. Wood's calculations.

■ Dr. Wood established the present value of the economic costs subsequent to trial with several different scenarios, as reflected in Plaintiff's Exhibit 13. *See* note 7, *infra*. These calculations incorporated three different care proposals: home care with private sitter, institutional care at the Coastal Center (Ladson), and institutional care in a residential group home. After a careful and circumspect review of all the evidence, this court finds that Randy's condition will necessitate that he remain at home and receive attendant care there until he reaches age 18.42, this being fourteen years from the date of trial. The present economic value of this element of damages is Four Hundred Fifty Thousand, Two Hundred Two and no/100 ($450,202.00) Dollars. This element must be reduced by the cost of raising a "normal" child until the same age. This cost is calculated to be Sixty-Two Thousand, Five Hundred and no/100 ($62,500.00) Dollars. Thus, the net allowable economic loss from birth to age 18.42 is Five Hundred Twelve Thousand, Three Hundred Seventy-One and no/100 ($512,371.00) Dollars.

Having found that Randy Phillips will need attendant care at home until age 18.42 years and that he has a prospective life expectancy of forty years, this court finds that his condition will necessitate his transfer to a residential group home, where he will remain from age 18.42 years to age forty years. Dr. Wood calculated the present value of this element of damages to be Seven Hundred Seventy-One Thousand, Three Hundred Ninety-Four and no/100 ($771,394.00) Dollars. Thus, the total economic damages from Randy's birth to his life expectancy of forty years is One Million, Two Hundred Eighty-Three Thousand, Seven Hundred Sixty-Five and no/100 ($1,283,765.00) Dollars.

### 3. Emotional Damages

■ As with economic damages, most cases that have considered wrongful birth claims have allowed damages for the parents' emotional suffering. *E.g., Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981).

However, while this court is convinced that emotional damages generally constitute a permissible element of damages in wrongful birth claims, the appropriateness of such damages in this particular case depends on the law of South Carolina concerning such emotional damages. 28 U.S.C. § 2674. *See, e.g., Padgett v. Colonial Wholesale Distributing Co.*, 232 S.C. 593, 103 S.E.2d 265 (1958).

Generally speaking, "emotional distress is a proper element of tort damage as long as such distress encompasses some physical manifestation." *Robertsen v. State Farm Mutual Automobile Ins. Co.*, 464 F.Supp. 876 (D.S.C.1979). *E.g., Padgett v. Colonial Wholesale Distributing Co.*, 232 S.C. 593, 103 S.E.2d 265 (1958). But see *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131, 447 N.E.2d 109 (1983) (contemporaneous physical injury not necessary for recovery of damages for emotional distress). As recently noted by the Honorable Falcon B. Hawkins in *Andrews v. United States*, 548 F.Supp. 603 (D.S.C.1982):

Mental pain and suffering in connection with a wrong is a proper element of actual damages in South Carolina where it is a proximate consequence of a wrong. *See Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981); *Lanford v. West Oakwood Cemetery Addition, Inc.*, 223 S.C. 350, 75 S.E.2d 865 (1953).

*Id.* at 612.

The testimony of Mrs. Phillips vividly depicts the anguish she experienced as a result of her child's condition. She described sitting up with Randy at night when he would "turn blue around the lips" Transcript at 124, her reaction when he would throw up three to four times a day, *id.* at 125, and the marital stress created by his condition. *Id.* at 129. Furthermore, Mrs. Phillips testified: "It upsets me knowing that he'll never be able to do the things that normal kids can do and not being able to do anything to change it." *Id.* at 130.

Mrs. Phillips gave up all social activity, became nervous and resorted to over-eating. Clearly, Mrs. Phillips is not able to live a normal life because of the special

care required by Randy. *Id.* at 130–32. Finally, she observed that, although she loved her child, "[h]e's also a source of heartache because I know I always had dreams of a little boy playing ball and doing things in school which I know he will never be able to do. So at times, he brings me sadness." *Id.* at 144. Aside from the marital difficulties, Mr. Phillips described feelings of anger, outrage, and disappointment, as well as gastrointestinal problems requiring medication. *Id.* at 191–200.

Recently, in *Naccash v. Burger,* 223 Va. 406, 290 S.E.2d 825 (Va.1982), the Chief Justice of the Virginia Supreme Court observed:

We believe that the circumstances of this case justify another exception to the general rule that damages for emotional distress are not allowable unless they result directly from tortiously caused physical injury. The restrictions upon recovery imposed by the provisos in earlier cases were designed to discourage spurious claims asserted by chance witnesses to physical torts involving others. The considerations prompting imposition of the limitations do not exist here; no one suggests that the Burgers' emotional distress was feigned or that their claim was fraudulent. Indeed, to apply the restrictions here, or to refuse to recognize an exception to the general rule, "would constitute a perversion of fundamental principles of justice." *Berman,* 80 N.J. at 433, 404 A.2d at 15.

Furthermore, we believe it would be wholly unrealistic to say that the Burgers were mere witnesses to the consequences of the tortious conduct involved in this case. In our view, the parents' emotional distress was no less a direct result endured by the plaintiffs in [the earlier cases involving intentional wrongdoing or physical contact]; the evidence shows an unbroken chain of causal connection directly linking the erroneous Tay-Sachs report, the deprivation of the parents' opportunity to accept or reject the continuance of Mrs. Burger's pregnancy, and the emotional distress the parents suffered following the birth of their fatally defective child.

*Id.* 290 S.E.2d at 831.

Thus, since the plaintiffs' emotional distress has been and continues to be accompanied by physical symptoms, this court can confidently predict that the South Carolina Supreme Court would follow those jurisdictions which permit wrongful birth plaintiffs to recover emotional distress damages. Moreover, the caesarean section performed at Randy's birth provided the "contact" required under the older case law. Transcript at 131.

The decisional law of South Carolina concerning damages for emotional distress reflects considerable expansion of this element of compensatory damages over the past three decades. In *Padgett v. Colonial Wholesale Distributing Co.,* 232 S.C. 593, 103 S.E.2d 265 (1958), the South Carolina Supreme Court "affirmed recovery of damages for shock, fright, and emotional upset despite the absence of any physical impact between the plaintiff and defendant." *Ford v. Hutson,* 276 S.C. 157, 160–61, 276 S.E.2d 776, 778 (1981). Under *Padgett,* the only pertinent question is whether plaintiff's emotional distress was manifested in physical symptoms; that is, "whether ... [plaintiff] had sustained physical or bodily injury as a consequence of the shock, fright and emotional upset experienced by him." *Padgett v. Colonial Wholesale Distributing Co.,* 232 S.C. 593, 103 S.E.2d 265, 272 (1958). This requirement of " 'objective symtomatology' " *Ford v. Hutson,* 276 S.C. 157, 162, 276 S.E.2d 776, 779 (1981), *quoting Vicnire v. Ford Motor Co.,* 401 A.2d 148 (Me.1979), has gradually been diminished as an absolute prerequisite to recovery for emotional distress damages. *Ford v. Hutson,* 276 S.C. 157, 162, 276 S.E.2d 776, 778–79 (1981). *E.g.,* RESTATEMENT (SECOND) OF TORTS § 46, Comment k (1965). Moreover, it is important to note that the line of cases culminating in *Ford v. Hutson, see, e.g., Hudson v. Zenith Engraving Co., Inc.,* 273 S.C. 766, 259 S.E.2d 812 (1979); *Bellamy v. General Motors Acceptance Corp.,* 269 S.C. 578,

239 S.E.2d 73 (1977); *Rhodes v. Security Finance Corp. of Landrum,* 268 S.C. 300, 233 S.E.2d 105 (1977); *Turner v. ABC Jalousie Co. of N.C.,* 251 S.C. 92, 160 S.E.2d 528 (1968), concern " 'tortious action[s] in which the sole damages alleged are those of mental anguish ....' " *Ford v. Hutson,* 276 S.C. 157, 161, 276 S.E.2d 776, 778 (1981) *quoting Hudson v. Zenith Engraving Co., Inc.,* 273 S.C. 766, 259 S.E.2d 812, 814 (1979) (emphasis added).

■ In addition to this line of cases concerning intentional or reckless infliction of emotional distress, other cases have allowed such damages when there is a violation of some other legal right for which damages are recoverable. *See Ford v. Hutson,* 276 S.C. 157, 159, 276 S.E.2d 776, 777 (1981). For example, damages for emotional suffering are recoverable in wrongful death actions under S.C.Code Ann. § 15–51–40 (1976). *E.g., Mishoe v. Atlantic Coast Line R. Co.,* 186 S.C. 402, 197 S.E. 97 (1938). Similarly, damages for emotional distress are recoverable when accompanied by other damages in negligence cases, *e.g., Kapuschinsky v. United States,* 259 F.Supp. 1 (D.S.C.1966), as well as extraordinary tort cases, *e.g., Lanford v. West Oakwood Cemetery Addition, Inc.,* 223 S.C. 350, 75 S.E.2d 865 (1953) (burial case).

■ In the present case, the economic damages suffered by plaintiffs are sufficient to remove the case from the category in which the sole damages alleged are those of mental anguish. Thus, damages for emotional distress would be permissible even assuming *arguendo* that there was no physical manifestation of those damages. As observed by the South Carolina Supreme Court in *Mishoe v. Atlantic Coast Line R. Co.,* 186 S.C. 402, 197 S.E. 97 (1938), "all damages, present and prospective, which are naturally the proximate consequence of the wrongful act" should be allowed. 197 S.E. at 105. After careful and circumspect consideration of the evidence, this court finds that an appropriate amount for this element of plaintiffs' dam-

ages is Five Hundred Thousand and No/100 ($500,000.00) Dollars.

### 4. "Benefits Rule"

■ Much of the confusion apparent in the area of damages has been created by the "benefits rule." *See* Restatement (Second) of Torts § 920 (1977). Admittedly, the physician's negligence may result in both benefits and detriments to the parents; despite the affliction of the child, the "parents may yet experience a love that even an abnormality cannot fully dampen." *Becker v. Schwartz,* 46 N.Y.2d 401, 414–15, 386 N.E.2d 807, 814, 413 N.Y.S.2d 895, 912 (1978). Indeed, Mrs. Phillips readily admitted that she loved her child, Transcript at 145–46, and that Randy was, in the words of counsel for defendant, "the sunshine of [her] life." *Id.* at 146.

This argument has been used in other cases to deny, as a matter of law, recovery for both pecuniary loss, *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979), and emotional anguish. *Becker v. Schwartz,* The principle underlying the benefits rule should not, however, operate as a complete bar to any element of plaintiffs' damages, with the possible exception of emotional distress. Although the benefits rule was originally propounded as a theoretical barrier to the recognition of wrongful pregnancy claims involving healthy children, *Phillips II,* 508 F.Supp. at 549, its application even in that context has gradually been restricted; it would be "myopic to declare today that the benefits [of parenthood] exceed the costs as a matter of law." *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175 (Minn.1977). Moreover, the benefits derived by the parents in a wrongful birth case are generally distinguishable from the benefits in a wrongful pregnancy case because the benefits in a wrongful birth case depend at least partially on the extent of the child's affliction. *Becker v. Schwartz.*

Thus, although the benefits rule is a legitimate factor in the calculation of damages, it should not improperly restrict the scope of permissible damages. "In calculating plaintiffs' damages, any benefits

**1320**

they derive from defendant's negligence may properly be offset against the detriments which flow from that conduct, in accordance with traditional tort principles." *Phillips II*, 508 F.Supp. at 555. Because the benefits at issue are essentially emotional in nature, the principle applies to the parents' mental suffering and emotional distress. The court finds that the "benefits" flowing from the child's birth despite his condition amount to fifty per cent of the damages for plaintiffs' mental anguish and emotional distress. Accordingly, the damages attributable to plaintiffs' emotional distress is reduced to Two Hundred Fifty Thousand and No/100 ($250,000.00) Dollars. Of the Two Hundred Fifty Thousand Dollars, eighty-five per cent of the damages, or Two Hundred Twelve Thousand, Five Hundred and No/100 ($212,500.00) Dollars is apportioned to Kathleen E. Phillips; and fifteen per cent of the damages, or Thirty-Seven Thousand, Five Hundred and No/100 ($37,500.00) Dollars, is apportioned to Dwight A. Phillips.

## IV. CONCLUSION

For the foregoing reasons, damages are awarded as follows: in the case of *William Randall Phillips, by his Guardian ad Litem, Dwight A. Phillips v. United States of America*, No. 79–553–8, Five Thousand and No/100 ($5,000.00) Dollars; in the case of *Dwight A. Phillips and Kathleen E. Phillips v. United States of America*, No. 79–551–8, One Million, Two Hundred Eighty-Three Thousand, Seven Hundred Sixty-Five and No/100 ($1,283,765.00) Dollars for economic loss;[10] Two Hundred Twelve Thousand, Five Hundred and No/100 ($212,500.00) Dollars to Kathleen E. Phillips for emotional distress and Thirty-Seven Thousand, Five Hundred and No/100 ($37,500.00) Dollars to Dwight A. Phillips for emotional distress, for a total of One Million, Five Hundred Thirty-Three Thousand, Seven Hundred Sixty-Five and

No/100 ($1,533,765.00) Dollars. The clerk will enter judgment in these two cases accordingly.

AND IT IS SO ORDERED.

---

**10.** At trial, Mr. and Mrs. Phillips expressed their desire to preserve the net economic award for the use and benefit of their son. Accordingly, counsel for plaintiff is directed to submit a plan to effectuate that intent within thirty (30) days of the filing of this order. There will be no disbursements of funds for the amount of the economic loss herein awarded to these plaintiffs until further order of the court.